498 A.2d 395

COMMONWEALTH of Pennsylvania, Appellee,

v.

Joseph MLINARICH, Appellant.

Superior Court of Pennsylvania.

Argued July 23, 1984.

Filed Aug. 30, 1985.

Robert D. Gleason, Johnstown, for appellant.

Dennis M. McGlynn, Johnstown, for Commonwealth, appellee.

Before SPAETH, President Judge, and WICKERSHAM, BROSKY, WIEAND, CIRILLO, DEL SOLE, MONTEMURO, JOHNSON and POPOVICH, JJ.

WIEAND, Judge:

The issue in this appeal is the interpretation to be placed upon the phrase "forcible compulsion" as it was used to define the crime of rape. What did the legislature intend when it defined rape as sexual intercourse with another person *"by forcible compulsion"* or *"by threat of forcible compulsion* that would prevent resistance by a person of reasonable resolution"? Did the legislature intend to include within the crime of rape acts of sexual intercourse induced by threats to do non-violent acts? After a careful

review of the legislative history of Section 3121 of the Crimes Code, 18 Pa.C.S. § 3121, and the legal decisions in this and other jurisdictions, we conclude that the legislature intended the term "forcible compulsion" to mean "physical compulsion or violence."

The complainant in this case had been committed to the Cambria County Detention Home at the age of thirteen after admitting the theft of her brother's ring. Joseph Mlinarich was a neighbor of the child's father. Mlinarich and his wife agreed to assume custody of the juvenile, who was then placed in their home. Shortly thereafter, on the occasion of the child's fourteenth birthday, Mlinarich allegedly asked her to undress and, when she complied, fondled her while she sat on his lap. When the juvenile asked him to stop, Mlinarich did so. The same scenario was repeated four or five times during the succeeding two weeks. Thereafter, on five separate dates, events occurred which led to criminal charges and convictions which are the subject of appellate review.

Because of events occurring on June 15, 1981, Mlinarich was convicted of attempted rape. The testimony of the juvenile was that appellant had threatened to send her back to the detention home if she refused to undress and engage in sexual intercourse. Although she undressed on that occasion, appellant's efforts to achieve penetration were unsuccessful. A similar incident occurred on June 19, 1981. Again, in response to a threat by appellant to send her back to the detention home and amidst her own tears, the juvenile submitted to appellant's unsuccessful attempts to penetrate her vagina. The events of this day were the basis for appellant's second conviction of attempted rape. By virtue of similar threats made on June 26, 1981, appellant was finally able to achieve penetration. For this he was convicted of rape. Because of events occurring on June 29 and July 1, appellant was also convicted of involuntary deviate sexual intercourse. Mlinarich was convicted additionally on five counts of corrupting the morals of a child for his conduct on all five dates and on two counts of

indecent exposure for conduct occurring on June 29 and July 1. On appeal, he contends that the Commonwealth failed to prove that he engaged in sexual acts with another person by forcible compulsion or threat of forcible compulsion.[1]

The crime of rape, a felony of the first degree, is defined at 18 Pa.C.S. § 3121 as follows:

A person commits a felony of the first degree when he engages in sexual intercourse with another person ...:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent.

This provision, we are admonished, "shall be construed according to the fair import of [its] terms." 18 Pa.C.S. § 105. Because it is a penal statute, however, it must be strictly construed. *Commonwealth v. Driscoll*, 485 Pa. 99, 107, 401 A.2d 312, 316 (1979) (plurality opinion); *Commonwealth v. Gordon*, 342 Pa.Super. 480, 487, 493 A.2d 691, 695 (1985); *Commonwealth v. Darush*, 256 Pa.Super. 344, 348, 389 A.2d 1156, 1158 (1978). Strict construction is necessary to avoid the injustice of convicting a person without clear notice to him that contemplated conduct is unlawful. *Commonwealth v. Broughton*, 257 Pa.Super. 369, 377, 390 A.2d 1282, 1286 (1978). It also serves to prevent courts from creating offenses which the legislature did not intend to create. *Commonwealth v. Cluck*, 252 Pa.Super. 228, 238, 381 A.2d 472, 477 (1977).

Our task in this case is made more difficult because the victim of appellant's sexual advances was a fourteen year old child. The definition which we adopt, however, will know no age limitation. It is with a view to general application, therefore, that we attempt to define the param-

---

1. Appellant does not challenge the sufficiency of the evidence to sustain the convictions for indecent exposure and corrupting the morals of a child.

eters of the legislative proscription against sexual intercourse by forcible compulsion or threat of forcible compulsion.

At common law, rape was defined as unlawful carnal knowledge of a woman, not a spouse, forcibly and against her will. *Commonwealth v. Stephens*, 143 Pa.Super. 394, 396, 17 A.2d 919, 920 (1941). This common law definition was incorporated into the statutory law of Pennsylvania from earliest times. It is the same definition which was included in Section 721 of the Penal Code of 1939.[2] The phrase "against her will" was held by the courts to be synonymous with absence of consent. The decided cases placed great emphasis on the presence or absence of consent in determining whether the crime of rape had been committed. Force, however, was also a necessary ingredient. *Commonwealth v. Jaynes*, 137 Pa.Super. 511, 10 A.2d 90 (1939). "The only relaxation of this rule [was] that this force [might] be constructive. Under this relaxation, it [was] held that where the female was an idiot, or had been rendered insensible by the use of drugs or intoxicating drinks, and, in one case, where she was under the age of ten years, she was incapable of consenting, and the law implied force." *Commonwealth v. Stephens, supra*, 143 Pa. at 399, 17 A.2d at 921.

The common law definition of rape was determined to be unsatisfactory. It was found inadequate not because of its insistence that force or violence be an essential element but because of its inordinate emphasis on "lack of consent." This element of the offense had been construed to require a woman to resist to the utmost. Therefore, whether she resisted sufficiently was deemed an issue for the jury in most cases where the charge was rape. The rule worked to the unfair disadvantage of the woman who, when threatened with violence, chose quite rationally to submit to her assailant's advances rather than risk death or serious bodily injury.

2. Act of June 24, 1939, P.L. 872, § 721, as amended, 18 P.S. § 4721 (repealed).

Because of the often unjust result achieved by the common law definition, the American Law Institute determined to find a more satisfactory approach. The original draft of the Model Penal Code proposed the establishment of separate crimes of "rape" and "intercourse without legally effective consent." The proposed crimes were defined as follows:

Section 207.4. Rape and Related Offenses.

(1) *Rape by Force or Its Equivalent.* A male who has carnal knowledge of a female not his wife commits a felony of the second degree if:

(a) *He compels her to submit by force or violence or out of fear that death or serious physical injury or extreme pain is about to be inflicted on her or a member of her family, or by threat to commit any felony of the first degree;* or

(b) For the purpose of preventing resistance he administers to her or employs, without her knowledge or consent, drugs, intoxicants, or other substance or force resulting in a major deficiency of the victim's power to appraise or control behavior; or

(c) The female is unconscious or physically powerless to resist; or

(d) The female is less than 10 years old (whether or not the actor is aware of that).

An offense within this subsection shall constitute a felony of the first degree if the actor inflicts serious physical injury upon the victim, or if the victim is not a voluntary social companion of the actor and has not previously permitted him sexual liberties.

(2) *Intercourse Without Legally Effective Consent.* A male who has carnal knowledge of a female not his wife, in situations not covered by subsection (1), commits a felony of the third degree if:

(a) *He compels her to submit by any intimidation* [which would prevent resistance by a woman of ordinary resolution] [reasonably calculated to prevent resistance]; or

(b) He knows that her submission is due to substantially complete incapacity to appraise or control her own behavior, but this paragraph shall not apply where a woman over 18 years of age loses that capacity as a result of voluntary use of [intoxicants or] drugs in the company of the actor; or

(c) He knows that the female submits because she is unaware that a sexual act is being committed upon her or because she falsely supposes that he is her husband; or

(d) The female is less than 16 years old and the actor is at least 5 [?] years older than she is; but it shall be a defense under this paragraph if the actor proves that the girl was a prostitute.

. . . .

Model Penal Code, § 207.4 (Tentative Draft No. 4 1955) (emphasis added). The Commentary explained that paragraph (a) of subsection (1) was intended to cover "the classic rape cases, where the woman [had been] overpowered by violence or the threat of it." By requiring only that the victim be "compelled to submit," and not that she resist "to the utmost," it was intended to eliminate to a great extent the requirement that a woman struggle when struggle would be useless and dangerous. Subsection (2), on the other hand, was designed to emphasize the absence of voluntary consent. The Comment stated:

*As the gravity of the threat diminishes, the situation gradually changes from one where compulsion overwhelms the will of the victim to a situation where she can make a deliberate choice to avoid some alternative evil. The man may threaten to disclose an illicit affair, to foreclose the mortgage on her parent's farm, to cause her to lose her job, or to deprive her of a valued possession. The situation may move into a shadow area between coercion and bargain.* A bargain for gain is not within the present section; but subsection 2(a) is designed to reach all situations of actual compulsion, i.e., where the female's submission is determined by fear of

harm, with an objective test of the efficiency of the coercive element.

(Emphasis added). Under this proposed statute, subsection (1) was designed to cover sexual intercourse accomplished by physical force or by threats which instilled fear of grave physical consequences to the victim or a member of her family, or fear of the perpetration of a serious crime. Subsection (2), on the other hand, sought to criminalize intercourse obtained by psychological duress rather than physical violence or threats thereof.

These definitions were modified when a corresponding provision was inserted into the Proposed Official Draft of the Model Penal Code. It was there proposed as follows:

Section 213.1 Rape and Related Offenses.

(1) *Rape.* A male who has sexual intercourse with a female not his wife is guilty of rape if:

(a) *he compels her to submit by force or by threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted on anyone;* or

(b) he has substantially impaired her power to appraise or control her conduct by administering or employing without her knowledge drugs, intoxicants, or other means for the purpose of preventing resistance; or

(c) the female is unconscious; or

(d) the female is less than 10 years old.

Rape is a felony of the second degree unless (i) in the course thereof the actor inflicts serious bodily injury upon anyone, or (ii) the victim was not a voluntary social companion of the actor upon the occasion of the crime and has not previously permitted him sexual liberties, in which case the offense is a felony of the first degree. Sexual intercourse includes intercourse per os or per anum, with some penetration however slight; emission is not required.

(2) *Gross Sexual Imposition.* A male who has sexual intercourse with a female not his wife commits a felony of the third degree if:

(a) *he compels her to submit by any threat* that would prevent resistance by a woman of ordinary resolution; or

. . . .

Model Penal Code, § 213.1 (Proposed Official Draft 1962) (emphasis added). This draft continued the distinction between "classic rape cases" involving force and situations where force was not present but the other person had not freely consented. The latter situation, which the proposed statute designated as "Gross Sexual Imposition," was defined as intercourse compelled "by *any threat* that would prevent resistance by a woman of ordinary resolution." (emphasis added).

In Pennsylvania, the Joint State Government Commission drafted a proposal similar to the Official Draft of the Model Penal Code. The proposed draft did not receive favorable action by the legislature, which, in 1972, enacted a Crimes Code containing the present definition of rape. The Crimes Code did not divide sex crimes into rape and gross sexual imposition. It did, however, divide rape under the Model Penal Code into two separate crimes. The statutory provision defining forcible rape eliminated language which would have defined rape to include intercourse with a child less than ten years of age. Instead, the legislature created a separate offense of statutory rape, a felony of the second degree, which it defined as sexual intercourse by a person eighteen years of age with a person not a spouse who is less than fourteen years of age. 18 Pa.C.S. § 3122.[3] See also: *Commonwealth v. Rhodes*, 332 Pa.Super. 273, 481 A.2d 610 (1984) (reargument denied September 26, 1984), *allocatur granted* July 2, 1985.

Instead of creating a separate crime of "gross sexual imposition," the legislature in Pennsylvania created one offense of forcible rape, a felony of the first degree. In

---

**3.** Under the Crimes Code as enacted originally, the crime of statutory rape was committed when a person sixteen years of age or older engaged in sexual intercourse with another person not his spouse who was less than sixteen years of age. Act of December 6, 1972, P.L. 1482. The current age provisions were added by amendment in 1976. Act of May 18, 1976, P.L. 120.

defining this offense, the legislature substituted for the language of the Model Penal Code, which had spoken of "force or ... threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted upon anyone," the words "forcible compulsion" or "the threat of forcible compulsion." It is significant that the legislature did not incorporate into the definition of rape those circumstances which, under the Model Penal Code, would have constituted "gross sexual imposition." This appears to have been intentional. Thus, where the Model Penal Code had spoken of *"any threat* that would prevent resistance by a woman of ordinary resolution" and had used those words to define the crime of gross sexual imposition, the legislature in Pennsylvania, in defining rape, spoke of sexual intercourse by forcible compulsion or *"threat of forcible compulsion* that would prevent resistance by a person of reasonable resolution." (emphasis added).

The conclusion which must be drawn from this legislative progression is that the legislature in Pennsylvania intended to exclude from its definition of rape those acts of intercourse where the victim's will was not overwhelmed by physical compulsion or violence or a threat thereof and where the victim had made a deliberate choice in order to avoid some alternative evil not amounting to bodily harm. See: Comment, *Revision of the Law of Sex Crime in Pennsylvania and New Jersey,* 78 Dick.L.Rev. 73, 79 (1973–74).

The term "force" and its derivative, "forcible," when used to define the crime of rape, have historically been understood by the courts and legal scholars to mean physical force or violence. Thus, American Jurisprudence in its second edition uses the terms "force" and "violence" synonymously while defining rape:

The term "by force" does not necessarily imply the *use of actual physical force* to compel submission of the victim to sexual intercourse, but it may mean *threatened force or violence* if the female does not comply. The threat of such force or violence may create a real apprehension of

dangerous consequences, or bodily harm, in order to prevent resistance or extort the consent of the victim, and if it so overpowers the mind of the victim that she dare not resist, it must be regarded in all respects equivalent to force actually exerted....

> To constitute rape, where there is no force used, the woman must have been unconscious, or unable fairly to comprehend the nature and consequence of the sexual act. If not, there is no distinction between rape, where the force used is constructive, and seduction.

65 Am.Jur.2d *Rape* § 4 (1972) (emphasis added) (footnotes omitted).

The legislatures of at least nine other states have employed the term "forcible compulsion" to define the crime of rape. Illustrative is the statute in New York which provides:

> A male is guilty of rape in the first degree when he engages in sexual intercourse with a female:
>
> 1. By forcible compulsion; or
>
> 2. Who is incapable of consent by reason of being physically helpless; or
>
> 3. Who is less than eleven years old.

N.Y.Penal Law § 130.35 (effective September 1, 1967). Similar language is used in the statutes of Alabama, Ala. Code § 13A–6–61; Arkansas, Ark.Stat.Ann. § 41–1803 (1977); Hawaii, Hawaii Rev.Stat. § 707–730; Kentucky, Ky. Rev.Stat. § 510.040; Missouri, Mo.Rev.Stat. § 566.030.1; Oregon, Or.Rev.Stat. § 163.375; and Washington, Wash. Rev.Code §§ 9A.44.040, 050.[4] The statutes in all these states include express definitions of the term "forcible compulsion" which are similar to the definition of rape included in the Model Penal Code. Thus, forcible compulsion has been legislatively defined to consist of either physical force or a threat thereof which places a person in fear of immediate death or physical injury or, in some

---

**4.** Connecticut also employed the phrase "forcible compulsion" before its statute was revised in 1975. (Formerly codified at Conn.Gen.Stat. §§ 53a–72).

instances, in fear that the victim or another person will be kidnapped. See: Ala.Code § 13A–6–60(8); Ark.Stat.Ann. § 41–1801(2); Hawaii Rev.Stat. § 707–700(12); Ky.Rev.Stat. § 510.010(2); Mo.Rev.Stat. § 556.061(11); N.Y.Penal Law § 130.00(8); Or.Rev.Stat. § 163.305(2); Wash.Rev.Code § 9A.44.010(5). See also former Conn.Gen.Stat. § 53a–65(8) (repealed in 1975).

The Supreme Court of Pennsylvania has defined "forcible compulsion" consistently with the definition followed by sister jurisdictions. The Court has done so in the context of interpreting the section of the Crimes Code which defines involuntary deviate sexual intercourse. In *Commonwealth v. Perrin*, 484 Pa. 188, 398 A.2d 1007 (1979), the appellant argued that the evidence was insufficient to sustain a conviction for involuntary deviate sexual intercourse. The Supreme Court said: "The crime of involuntary deviate sexual intercourse is committed when a person forces another person by actual physical compulsion or threats thereof to engage in acts of anal or oral intercourse." *Id.*, 484 Pa. at 192, 398 A.2d at 1009–1010. This interpretation of the statute, even though it must be deemed dictum in view of the facts of the case, is worthy of weighty consideration. See: *Gordon Lubricating Co. v. Allegheny County Board of Property Assessment, Appeals and Review*, 204 Pa.Super. 441, 444, 205 A.2d 704, 706 (1964), *aff'd per curiam*, 418 Pa. 625, 211 A.2d 284 (1965). It represents an expression by the highest court of this Commonwealth that "forcible compulsion" is equivalent to "physical compulsion" rather than "psychological duress." As an intermediate appellate court we adopt the Supreme Court's interpretation of "forcible compulsion" and apply it to the issue now before us.

This Court has also considered the intent of the legislature in using the term "forcible compulsion." In *Commonwealth v. Biggs*, 320 Pa.Super. 265, 467 A.2d 31 (1983), a unanimous panel of this Court held that sexual intercourse induced by moral persuasion, in the form of a biblical admonition, was not rape. The Court said: "We cannot

ignore the clear import of the language of section 3121 by upholding defendant's conviction in the absence of any evidence that Marion Biggs submitted to intercourse out of fear of an exercise of force by her father." *Id.*, 320 Pa.Superior Ct. at 268, 467 A.2d at 32. The definition of "forcible compulsion" which we adopt today is consistent with the holding in *Biggs*.

■ The interpretations of "forcible compulsion" advocated by the writers of the separate dissenting opinions are inconsistent not only with the fair import of the word "force" but also with all legally recognized definitions of the term. President Judge Spaeth would define "forcible compulsion" as any "compulsion by physical, moral, or intellectual means or by the exigencies of the circumstances." This definition of "forcible compulsion," however, is sufficiently broad to include "threats." If the threat is itself the forcible compulsion necessary to constitute rape, then the requirement that a threat be such as "would prevent resistance by a person of reasonable resistance" has been rendered unnecessary verbiage and has, for practical purposes, been removed from the statutory definition of the offense. This is illustrated by the facts of the instant case where, according to President Judge Spaeth's definition, appellant's "threat" to return the juvenile to the detention home would itself be the "forcible compulsion" required by the statute for a conviction of rape. Judge Popovich, on the other hand, would simply eliminate the words "of forcible compulsion" as used by the legislature to modify the noun "threat" and would define rape to include sexual intercourse induced by "any threat." In construing a statute, however, a court must assume the legislature intended that every word is to be given effect. *Crusco v. Insurance Co. of North America*, 292 Pa.Super. 293, 297, 437 A.2d 52, 53–54 (1981). See also: *Cerrato v. Holy Redeemer Hospital*, 342 Pa.Super. 551, 554, 493 A.2d 728, 729 (1985). Moreover, the interpretation proposed by Judge Popovich, as we observed during our recitation of the legislative history of the rape section of the Crimes Code,

was unequivocally rejected by the legislature in Pennsylvania. Judge Johnson has not attempted to define "forcible compulsion" and appears to be willing to determine on an ad hoc basis the types of threats which will be deemed sufficient to transform sexual intercourse into forcible rape. It seems clear, however, that he will require something less than physical compulsion or violence or a threat of physical compulsion or violence.

■ Research has disclosed neither statute nor judicial decision which supports the approaches advocated by the dissenters. Although this fact, standing alone, does not proscribe the articulation of their respective views, it does suggest an unlikelihood that the legislature, by using the term "forcible compulsion," intended to define the crime of rape in an unprecedented manner to include acts not heretofore contemplated as being within the conceptual boundaries of the crime. As an intermediate appellate court we are not free to move beyond prior legal concepts, reject prior judicial decisions and substitute for the fair import and well defined meaning of "force" a generic definition which contains few, if any, limitations and expands the crime of rape to heretofore unimagined parameters. If a new crime is to be created, it should be created by the legislature.

To define "forcible compulsion" so as to permit a conviction for rape whenever sexual intercourse is induced by "any threat" or by "physical, moral or intellectual means or by the exigencies of the circumstances" will undoubtedly have unfortunate consequences. If a man takes a destitute widow into his home and provides support for her and her family, such a definition of forcible compulsion will convict him of attempted rape if he threatens to withdraw his support and compel her to leave unless she engages in sexual intercourse. Similarly, a person may be guilty of rape if he or she extorts sexual favors from another person upon threat of discharging the other or his or her spouse from a position of employment, or upon threat of foreclosing the mortgage on the home of the other's parents, or

upon threat of denying a loan application, or upon threat of disclosing the other's adultery or submission to an abortion. An interpretation of forcible compulsion which employs an ambiguous, generic definition of force will create the potential for a veritable parade of threats, express and implied, in support of accusations of rape and attempted rape. To make it even more troublesome, such an interpretation of forcible compulsion will place in the hands of jurors almost unlimited discretion to determine which acts, threats or promises will transform sexual intercourse into rape. Without intending to condone any of the foregoing, reprehensible acts, our use of them serves to illustrate the intolerable uncertainty which a wholly elastic definition of rape will create.

The legislature, we conclude, did not intend to equate seduction, whether benign or sinister, with rape and make it a felony of the first degree. To allow a conviction for rape where the alleged victim has deliberately chosen intercourse in preference to some other unpleasant sensation not amounting to physical injury or violence would be to trivialize the plight of the helpless victim of a violent rape. The latter is truly a felony of the first degree. The former is not. The two scenarios, although reprehensible, are not the same. The legislature has recognized this distinction, and we are not free to ignore its judgment or to redefine the law to meet new and different concepts of justice according to our own philosophical beliefs.

The provisions of the Pennsylvania Crimes Code are in pari materia and must be construed, if possible, as one statute. *Commonwealth v. Lobiondo*, 501 Pa. 599, 603, 462 A.2d 662, 664 (1983); 1 Pa.C.S. § 1932(b). An interpretation of "force" which would sustain appellant's convictions in this case would have unfortunate consequences if it were to be applied to other sections of the Crimes Code. In Chapter 5, for example, the use of deadly force is held to be justifiable when the actor "believes that such force is necessary to protect himself [or herself] against death, serious bodily injury, kidnapping or *sexual intercourse compelled*

*by force or threat."* 18 Pa.C.S. § 505(b)(2) (emphasis added). If we were to apply definitions of "force," as suggested by the dissenters, the use of deadly force would be justified whenever a person believed that he or she was being coerced to engage in sexual intercourse by moral or intellectual means or by threats of non-violent acts. The complainant in this case would, according to such an interpretation of forcible compulsion, have been justified in using deadly force because appellant attempted to extort sexual favors by threatening to remove her from his home and return her to detention. This was not a result intended by the legislature.

The interpretation of "forcible compulsion" urged upon us by the Commonwealth and also by the dissenters will approach absurdity if one attempts to apply it to the newly created offense of spousal rape. The new crime of "spousal sexual assault" was enacted into law on December 21, 1984 and became effective on February 19, 1985. It provides, in part, as follows:

§ 3128. Spousal Sexual Assault.

(a) Sexual Assault.—A person commits a felony of the second degree when that person engages in sexual intercourse with that person's spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution; or

(3) who is unconscious.

18 Pa.C.S. § 3128(a). If "forcible compulsion" is to include sexual intercourse induced by "any threat" or by "moral or intellectual means or the exigencies of the circumstances," the legislature may well have created a legal monster beyond its comprehension by inviting courts and juries into the privacy of the marital bedroom for the purpose of supervising the manner in which marital relationships are consummated. It is one thing to punish a person who physically and violently forces his or her spouse to engage in sexual intercourse against the other's will. It is quite another, and beyond all reasonable comprehension, to im-

pose harsh criminal penalties upon a spouse, husband or wife, who chooses to use "intellectual or moral means" or who exploits the exigencies of the circumstances to obtain the other's active or passive participation in sexual intercourse.

The legislative history of the marital rape law suggests that the legislature intended in 1984, as it did in 1972 when the Crimes Code was initially enacted, that "forcible compulsion" meant physical force or violence. During debate in the Senate, the sponsor of the amendment, Senator Shumaker, said:

> The elements of proof [of the marital rape bill] are the same as those existing from common law times and currently set forth in [the] [Crimes] [C]ode: *Sexual intercourse imposed by force or threat of force involving threats of death or serious bodily harm;* penetration against the victim's will, however slight; and lack of consent to sexual contact or intercourse.

1984 Pa. Legislative Journal 2858 (October 2, 1984) (Statement of Sen. Shumaker) (emphasis added).

■ For all these reasons, this Court accepts the definition of forcible compulsion stated by the Supreme Court in *Commonwealth v. Perrin, supra.* We hold that rape, as defined by the legislature at 18 Pa.C.S. § 3121(1) and (2), requires actual physical compulsion or violence or a threat of physical compulsion or violence sufficient to prevent resistance by a person of reasonable resolution. Applying that definition to the facts of the instant case, a threat to withdraw custodial care and return a juvenile to a detention home was not "forcible compulsion" sufficient to make rape out of appellant's act of sexual intercourse. It does not imply condonation of appellant's conduct to suggest that, although reprehensible, it did not constitute the crime of forcible rape as defined by the legislature at 18 Pa.C.S. § 3121.

■ Appellant's conduct on June 29 and July 1, however, was sufficient to constitute the crime of involuntary deviate sexual intercourse in violation of 18 Pa.C.S. § 3123(5). This

subsection defines the offense to include deviate sexual intercourse with another person "who is less than 16 years of age."

■ Although the trial court did not specifically instruct the jury regarding the requirements for a conviction under subsection (5) of the involuntary deviate sexual intercourse section (18 Pa.C.S. § 3123), this omission was not called to the trial court's attention and was thereby waived. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974); *Commonwealth v. McGinnis*, 336 Pa.Super. 601, 606, 486 A.2d 428, 430 (1984). Moreover, the omission was harmless. The jury necessarily found that appellant had engaged in deviate sexual intercourse with the complaining witness, and there is no doubt—even appellant concedes—that he knew the alleged victim to be less than 16 years of age. This finding of guilt, therefore, was proper and will be sustained.

■ With respect to indefinitely suspended sentences imposed by the trial court, they are not sanctioned by the Sentencing Code. *Commonwealth v. Ferrier*, 326 Pa.Super. 331, 473 A.2d 1375 (1984). Nevertheless, "the entry of a suspended sentence is an exhaustion of the sentencing power. Thus such judgments of sentence are final and subject to the constraints of the double jeopardy protection." *Commonwealth v. Goldhammer*, 507 Pa. 236, 248 n. 5, 489 A.2d 1307, 1313 n. 5 (1985) (citation omitted).

The judgments of sentence imposed for convictions of rape and attempted rape are reversed and set aside. The judgments of sentence imposed for involuntary deviate sexual intercourse and corrupting the morals of a child are affirmed. The convictions for indecent exposure merged into the convictions for involuntary deviate sexual intercourse; and the separate sentences imposed for those convictions, therefore, are vacated and set aside.

POPOVICH, J., files a concurring and dissenting statement.

SPAETH, President Judge, files a dissenting opinion in which WICKERSHAM, J., joins.

JOHNSON, J., files a dissenting opinion.

POPOVICH, Judge, concurring and dissenting:

I agree with Judge Spaeth that appellant's conduct did rise to the level of threat of forcible compulsion. I write separately to add that I would define threat of forcible compulsion to include *any* threat which overbears the will of a person of reasonable resolution under the circumstances of the situation.

I disagree with Judge Spaeth that the case must be remanded for a new trial. The charge to the jury was in accordance with Pennsylvania Standard Jury Instructions and a specific charge as to the definition of forcible compulsion was not requested by appellant. Indeed, appellant would not have ever requested an instruction which encompassed a definition beyond purely physical compulsion. Since the jury found appellant guilty and today a majority of our court finds the evidence sufficient to support this verdict, *a fortiori* the jury would have found appellant guilty had it had the benefit of our definition of forcible compulsion. A new trial in such a case is simply not required.

SPAETH, President Judge, dissenting:

A majority of the court today holds that the term "forcible compulsion" contained in the Crimes Code definitions of rape and involuntary deviate sexual intercourse, 18 Pa.C.S. §§ 3121, 3123, means "physical compulsion or violence." Proceeding from the same legislative history that the majority has analyzed, I am led to quite a different conclusion: By the term "physical compulsion" the General Assembly meant "compulsion by physical, moral, or intellectual means or by the exigencies of the circumstances." That we begin at the same point and end so far apart suggests not so much the difficulty issue, or its importance, neither of which may be discounted, as a fundamental clash over how

the law is to regard the crime of rape and its victims. I regret that we have been unable to provide a unified response to the question before us. I hope, however, that in the several opinions filed today we have at least provided the basis for a debate that will resolve the question.

Appellant was convicted by a jury on one count of rape, two counts of attempted rape, two counts of involuntary deviate sexual intercourse, two counts of indecent exposure, five counts of corrupting the morals of a minor, and five counts of endangering the welfare of children. The trial court vacated the convictions on the five counts of endangering the welfare of children, but otherwise denied appellant's motion in arrest of judgment or for new trial. Following the imposition of sentence, appellant took this appeal. He raises four issues: 1) that the evidence was insufficient; 2) that the trial court's instruction to the jury was inadequate; 3) that the convictions of indecent exposure should merge with the convictions of involuntary deviate sexual intercourse; and 4) that the complainant was not competent to testify.

Appellant's argument that the evidence was insufficient requires us to consider the meaning of the term "forcible compulsion" as used in Section 3121 of the Crimes Code, 18 Pa.C.S. § 3121, which defines the crime of rape, and Section 3123 of the Crimes Code, 18 Pa.C.S. § 3123, which defines the crime of involuntary deviate sexual intercourse. As I have said, I should hold that "forcible compulsion" means "compulsion by physical, moral, or intellectual means or by the exigencies of the circumstances." By this standard, the evidence was sufficient. Nevertheless, I find that the trial court's instruction to the jury was inadequate. I should therefore vacate the judgments of sentence for rape, attempted rape, and involuntary deviate sexual intercourse, and remand for a new trial on those charges. This conclusion makes it unnecessary for me to reach appellant's merger argument. His argument that the complainant was not competent to testify is without merit.

Appellant has not challenged his convictions of indecent exposure and corrupting the morals of a minor. However, on the convictions of indecent exposure, and on four of the five counts charging appellant with corrupting the morals of a minor, suspended sentences were imposed. I should vacate the suspended sentences as illegal sentences.

In May 1981 the complainant was living in Vintondale, Cambria County, in one half of a double house with her older brother, Gary, and his wife and child. The complainant's father and her other siblings lived in the other half of the double house. When a ring belonging to Gary could not be found, Gary asked the complainant if she had taken it, and she admitted that she had, and had lost it. To teach the complainant a lesson, criminal charges were filed against her. Gary testified that his intent was to "put her in juvenile for a couple days and then I would drop the charges to see what she really did with it." N.T. 1/21/82, 7. Consequently, on May 23 the complainant was committed by court order to the custody of the Cambria County Detention Home.

Appellant lived two doors from the house of the complainant's father, with his wife, aged mother, and sister. Appellant was unemployed. Appellant's wife worked as a nurse's aide, and the complainant had done housework for her. Appellant and his wife had known the complainant's father for about six years, and when the complainant was committed to the detention home, appellant's wife suggested that the complainant live with her and appellant. The complainant's father thought that this was a good idea, and on May 26, after a juvenile hearing, the complainant was released into the custody of appellant's wife, pending further court proceedings.

The complainant celebrated her fourteenth birthday on May 28, 1981, at appellant's home. She testified that on that evening appellant began to fondle her and that she told him that he should not do that. N.T. 1/21/82, 143–46. She did not report this incident to appellant's wife, being afraid that she would speak to appellant about it and he would get

angry. N.T. 1/21/82, 147. The complainant testified that this sort of incident was repeated "[a] couple times a week", N.T. 1/21/82, 147, and that when she told appellant that she did not want him to touch her and would cry, he would stop, N.T. 1/21/82, 150.

The information charges that on or about June 15, 19, and 26, 1981, appellant engaged in sexual intercourse with the complainant by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution. The complainant testified that appellant's wife was never home during the incidents in question. She said that the first incident began with appellant asking her to take her clothes off. When she did not remove her bra and underwear, "he [appellant] said, 'Take them off.' I said, 'No.' He said, 'Yes, or he would send me back to the DH [detention home]. So, I took them off. Then, he took his clothes off." N.T. 1/21/82, 156. After they had their clothes off, the complainant told appellant she did not want to do anything, and cried, but "[h]e said, 'You did it before, you can do it now' ", and that "[i]f I didn't do it, he would send me back." N.T. 1/21/82, 155. Appellant then got on the sofa bed next to the complainant and tried to penetrate her. Since appellant does not challenge the sufficiency of the evidence of intercourse, I shall not describe those aspects of the complainant's testimony except to note that she testified that she felt pain and was "screaming and hollering" and "crying." N.T. 1/21/82, 157. The second and third incidents happened in much the same way, with the complainant crying and saying that she did not want to participate because she did not think that it was right, and with appellant threatening to send her back to the detention home. N.T. 1/21/82, 159–64. The complainant testified that she was afraid of going back to the detention home. N.T. 1/21/82, 159.

The information also charges that on or about June 29 and July 1, 1981, appellant engaged in involuntary deviate sexual intercourse with the complainant. The complainant testified that during the first incident appellant kept push-

ing her head down to his penis and that she was struggling, crying and yelling at him to quit it. N.T. 1/21/82, 167–68. She told appellant that she was going to tell her father and he replied that "[h]e would send me to the DH", and that "[h]e wouldn't let my dad see me because he had me now." N.T. 1/21/82, 168, 169. The second incident was similar.

On July 2, 1981, the complainant testified, appellant "asked me to do that again, and I wouldn't. So, he started yelling at me and calling me names." N.T. 1/21/82, 171. She said that she was leaving and went to her father's home and told him what had happened. N.T. 1/21/82, 172.

–1–

Appellant argues that he must be discharged because the foregoing evidence was insufficient to prove the degree of compulsion that must be proved before one may be convicted of rape. Specifically, he argues that "although the courts no longer require [proof of] actual physical violence they do require [proof] that the actions of the defendant create[d] a reasonable fear of physical harm." Brief for Appellant at 18–19. In appellant's view, his threat to send the complainant back to the detention home if she did not submit to his demands "[did] not give rise to the level of force or threat contemplated by the courts.... [citing cases]." *Id.* at 19.

In considering this argument, I start with the observation that it misstates the issue we must decide. The issue is not what degree of compulsion "the courts" "require" or "contemplate[ ]". To be sure, that used to be the issue, for rape used to be a common law crime. However, the Crimes Code has abolished common law crimes. 18 Pa.C.S. § 107(b). The issue we must decide, therefore, is not whether the evidence was sufficient to prove rape at common law, that is, rape as defined by the courts, but whether the evidence was sufficient to prove rape as defined by the legislature, in the Crimes Code.

The legislature has defined rape as follows:

A person commits [rape] a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged that such person is incapable of consent.

18 Pa.C.S. § 3121.

Appellant concedes—by not arguing otherwise—that the evidence was sufficient to prove that he "engage[d] in sexual intercourse with another person not his spouse." 18 Pa.C.S. § 3121. Therefore, we are left with two questions: First, was the jury entitled to find from the evidence that appellant's threat to send the complainant back to the detention home if she did not submit to his demands constituted a "threat of forcible compulsion". 18 Pa.C.S. § 3121(2). And second, if so, was the jury further entitled to find that the threat was such as "would prevent resistence by a person of reasonable resolution"? *Id.* Of course, in considering what the jury was entitled to find, we must assume that the jury regarded the evidence, and all reasonable inferences from it, in the light most favorable to the Commonwealth. *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied Pennsylvania v. Lovette*, 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983).

It is frequently said that the words of a statute are to be "given their plain meaning," or are to be "understood according to their common and approved usage." *See, e.g., Commonwealth v. Stanley*, 498 Pa. 326, 446 A.2d 583 (1982); 1 Pa.C.S. § 1903(a). These maxims, however, will not yield the meaning of the phrase, "threat of forcible compulsion," for "force" has more than one plain, or common and approved, meaning. Webster's Third New International Dictionary (1968) provides eleven definitions of

"force," some of these being subdivided. The first seven are as follows:

²**force** /"/ *vb* -ED/-ING/-s [ME *forcen,* fr. MF *forcier, forcer* to attack, rape, compel, fr. (assumed) VL *fortiare,* fr. L *fortis* strong] *vt* **1 :** to do violence to; *esp* : RAPE < a maiden *forced* by the intruder> **2 :** to constrain or compel by physical, moral, or intellectual means or by the exigencies of circumstances <*forced* by injuries to stay at home> < hunger *forced* him to forget his scruples> < such evidence ˜s conviction on the mind> < financial weakness ˜s many small businesses to the wall> **3 :** to make, cause, make to be, or accomplish through natural or logical necessity <˜s the diameters to be equal —Josiah Royce> **4 a :** to press, drive, attain to, or effect as indicated against resistance or inertia by some positive compelling force or action < ˜your way through> <much of the previously unobtainable oil is *forced* to the surface —*Amer. Guide Series: Pa.*> < basic problems *forced* on us by the age in which we live —J.B. Conant> **b :** to press, impose, or thrust urgently, importunately, inexorably < he *forced* his personality upon his little world by organizing an army —L.C. Powys> < ˜his attentions on a woman> **c :** to drive (as warm air) through or into a duct or channel by some impelling force (as a fan) < ˜the caulking compound into the crevices> **5 :** to achieve or win by strength in struggle or violence: **a :** to win one's way into : storm successfully : enter in attack < ˜a castle> **b :** to effect a passage through by overcoming defenses <*forced* the mountain passes —O.L. Spaulding> **c :** to break open or through < ˜a lock> < eventually the gate was *forced*> **6 a :** to raise, accelerate, or heighten to the utmost <*forcing* the pace>; *sometimes* : to intensify the action and pressure in (as a game) < *forced* the game by a series of brilliant plays> **b :** to give forth, emit, produce only with unnatural or unwilling effort, not freely, spontaneously < the laughter was *forced* and unnatural —Sherwood Anderson> **c :** to wrench, strain, use with marked unnaturalness and lack of ease : press to an unusual use, past a usual limit, or

into an unusual meaning or interpretation < to ¨ to dislo-
cate if necessary, language into his meaning —T.S. Eli-
ot> < a *forced* interpretation of the passage> **7 a :** to
hasten the speed, growth, progress, developing, or matur-
ing of (as through artificial means, maximum effort, close
care, or individual attention) < a *forced* march> < chil-
dren *forced* into early maturity by heavy responsibili-
ties> **b :** to bring (plants or their wanted parts, as
flowers or fruit) to maturity out of the normal season (as
by the use of heat and special lighting) < *forcing* lilies for
the Easter trade>
*Id.* at 887.

As one considers the range and tone of these several
definitions it becomes evident that appellant's threat to send
the complainant back to the detention home if she did not
submit to his demands might, or might not, have been a
"threat of forcible compulsion." It was *not* such a threat if
"forcible" is to be considered as limited to meaning "to do
violence to"; it *might* have been such a threat if "forcible"
is to be construed as meaning "to constrain or compel by
physical, moral, or intellectual means or by the exigencies
of the circumstances," or as meaning "to press, impose, or
thrust urgently, importunately, inexorably."

The same possibility of reaching conflicting conclusions—
"forcible compulsion" or no "forcible compulsion"—be-
comes evident upon examining the synonyms of "force."
As the editors of Webster's observe, in commenting on
these synonyms: "FORCE is a general term indicating use
of strength, power, weight, stress, duress in overcoming
resistance." Appellant did not threaten "to do violence to"
the complainant in the same way as often occurs in rape
cases—for example, he made no threat to kill or beat her.
However, the jury was entitled to find, if not a threat of
"violence", then a threat of some sort of application of
"strength"; for the complainant did not want to return to
the detention home and therefore in some way would have
had to have been "forced" to return. The jury was also
entitled to find that appellant had used the "power" and

"weight" of his authority over the complainant, and had subjected her to "stress" and "duress", in order to overcome her resistance to his demands.

Our problem, therefore, is, not to choose *the* "plain meaning" of the phrase, "threat of forcible compulsion," but, rather, to decide *which of several* plain meanings the legislature had in mind when it used the phrase in enacting the Crimes Code. In resolving this problem, it will be helpful to examine the several sources of the Crimes Code, more specifically, of the Code's definition of the crime of rape. Three sources in particular may be identified: prior law (both common law and statutory); the Model Penal Code, Proposed Official Draft, 1962; and the Proposed Crimes Code, embodying the recommendations of the Joint State Government Commission after consultation with the Pennsylvania Bar Association. To make comparison easy, Section 721 of The Penal Code of 1939, Act of June 24, 1939, P.L. 872, § 721, as amended, Special Sess. No. 3, May 12, 1966, P.L. 84, § 1, 18 P.S. § 4721; Section 213.1 of the Model Penal Code; Section 1201 of the Proposed Crimes Code; and Section 3121 of the Crimes Code, are set out in the footnote.[1]

1.          **PENAL CODE OF 1939, AS AMENDED**

**§ 4721. Rape**

(a) Whoever has unlawful carnal knowledge of a woman, forcibly and against her will, is guilty of rape, a felony, and on conviction, shall be sentenced to pay a fine not exceeding ten thousand dollars ($10,000), and undergo imprisonment, by separate or solitary confinement at labor for a term the length of which shall be determined by the court but shall not be less than fifteen (15) years or more than life if in the course of the commission of the act, he inflicts serious bodily injury upon anyone. In all other cases he shall be sentenced to pay a fine not exceeding ten thousand dollars ($10,000), or undergo imprisonment by separate or solitary confinement at labor or by simple imprisonment for a term which shall be determined by the court, the maximum of which shall not exceed twenty (20) years, or both.

As used in this section the term "serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any member or organ of the body.

(b) Whoever, being of the age of sixteen (16) years and upwards, unlawfully and carnally knows and abuses any woman child under

the age of sixteen (16) years with her consent, is guilty of statutory rape, a felony, and on conviction, shall be sentenced to pay a fine not exceeding seven thousand dollars ($7,000), or undergo imprisonment, by separate or solitary confinement at labor, or by simple imprisonment, not exceeding fifteen (15) years or both.

Upon the trial of any defendant charged with the unlawful carnal knowledge and abuse of a woman child under the age of sixteen (16) years, if the jury shall find that such woman child was not of good repute, and that the carnal knowledge was with her consent, the defendant shall be acquitted of rape, and be convicted of fornication.

## MODEL PENAL CODE

Section 213.1.  Rape and Related Offenses.

(1) *Rape.*  A male who has sexual intercourse with a female not his wife is guilty of rape if:

(a) he compels her to submit by force or by threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted on anyone;  or

(b) he has substantially impaired her power to appraise or control her conduct by administering or employing without her knowledge drugs, intoxicants or other means for the purpose of preventing resistance;  or

(c) the female is unconscious;  or

(d) the female is less than 10 years old.

Rape is a felony of the second degree unless (i) in the course thereof the actor inflicts serious bodily injury upon anyone, or (ii) the victim was not a voluntary social companion of the actor upon the occasion of the crime and had not previously permitted him sexual liberties, in which cases the offense is a felony of the first degree.  Sexual intercourse includes intercourse per os or per anum, with some penetration however slight;  emission is not required.

(2) *Gross Sexual Imposition.*  A male who has sexual intercourse with a female not his wife commits a felony of the third degree if:

(a) he compels her to submit by any threat that would prevent resistance by a woman of ordinary resolution;  or

(b) he knows that she suffers from a mental disease or defect which renders her incapable of appraising the nature of her conduct;  or

(c) he knows that she is unaware that a sexual act is being committed upon her or that she submits because she falsely supposes that he is her husband.

## PROPOSED CRIMES CODE

Section 1201.  *Definitions.*—In this article, unless a different meaning plainly is required:

(1) the definitions given in section 901 apply;  and

(2) "Sexual intercourse," in addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight;  emission is not required;

(3) "Deviate sexual intercourse" means sexual intercourse per os or per anus between human beings who are not husband and wife, and any form of sexual intercourse with an animal;

As one works one's way through a comparison of these several sources, it becomes apparent that in enacting the Crimes Code, the legislature selected some aspects of the sources, while rejecting other aspects. The question therefore arises whether an analysis of this process of selection and rejection will disclose how the legislature intended the phrase, "threat of forcible compulsion," to be understood.

(4) "Sexual contact" is any touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in either person.

SECTION 1202. *Rape and Related Offenses.*—(a) *Rape.* A male who has sexual intercourse with a female not his wife is guilty of rape if:

(1) he compels her to submit by force or by threat of imminent death, serious bodily injury, or kidnapping, to be inflicted on anyone; or

(2) he has substantially impaired her power to appraise or control her conduct by administering or employing without her knowledge drugs, intoxicants or other means for the purpose of preventing resistance; or

(3) the female is unconscious; or

(4) the female is less than fifteen (15) years old; or

(5) he knows that she suffers from a mental disease or defect which renders her incapable of appraising the nature of her conduct.

Rape is a felony of the first degree if: (i) in the course thereof the actor inflicts serious bodily injury upon anyone; or (ii) the victim was not a voluntary social companion of the actor upon the occasion of the crime and had not previously permitted him sexual liberties.

In all other cases the offense is a felony of the second degree.

(b) *Gross Sexual Imposition.* A male who has sexual intercourse with a female not his wife commits a felony of the third degree if:

(1) he compels her to submit by any threat that would prevent resistance by a woman of ordinary resolution; or

(2) he knows that she is unaware that a sexual act is being committed upon her or that she submits because she mistakenly supposes that he is her husband.

## CRIMES CODE

### § 3121. Rape

A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent.

Sometimes the differences between the Crimes Code and its sources are a matter of style rather than substance. For example: The Penal Code had used the phrase, "Whoever has unlawful carnal knowledge of a woman ..." The Model Penal Code and Proposed Crimes Code both provided, "A male who has sexual intercourse with a female not his wife...." In enacting the Crimes Code, the legislature selected the more modern language, "sexual intercourse," and the more abstract language, "person" instead of "male", and "not his spouse" instead of "female not his wife." Certainly the first of these selections was stylistic only and the others also seem stylistic only. Although the Penal Code did not explicitly exclude the situation where a woman was forced to submit to sexual intercourse by her husband, probably exclusion was implied by the adjective "unlawful," before the phrase "carnal knowledge of a woman;" and cases holding that the element of carnal knowledge was proved by penetration, however slight, assumed penetration of the vagina, *see, e.g., Commonwealth v. Green*, 210 Pa.Super. 482, 233 A.2d 921 (1967), which is to say that a "person" not a "male" could not commit rape.

It is fair to say that such changes in style disclose nothing about the legislature's intent—except the intent to express itself in language it thought more acceptable, and I mention the changes only preliminarily, and, so to speak, to get them out of the way.

Turning then to a substantive comparison of the Crimes Code and its sources, initially it may be noted that in several respects the legislature retained, or carried forward, the common law, at least in main part. Thus, at common law "carnal knowledge" had been interpreted to require only penetration, however slight; emission was not required. *See, e.g., Commonwealth v. Green, supra.* The Model Penal Code, the Proposed Crimes Code, and the Crimes Code as enacted, all retained this aspect of the common law. At common law the requisite force could be constructive, or implied, as, for example, if the victim were asleep or unconscious, or rendered insensible by drugs or

intoxicating drinks, or incapable of rational consent because underage or insane. *See, e.g., Commonwealth v. Stephens,* 143 Pa.Super. 394, 17 A.2d 919 (1941). Again, the Model Penal Code, the Proposed Crimes Code, and the Crimes Code as enacted, all, with some variation, retained this aspect of the common law. At common law a conviction could rest on the uncorroborated testimony of the victim. *See, e.g., Commonwealth v. Lytes,* 209 Pa.Super. 436, 228 A.2d 922 (1967); *Commonwealth v. Ebert,* 146 Pa.Super. 362, 22 A.2d 610 (1941). Both the Model Penal Code and the Proposed Crimes Code provided that "[n]o person shall be convicted ... upon the uncorroborated testimony of the alleged victim." Model Penal Code, § 213.6; Proposed Crimes Code, § 1207(e). In enacting the Crimes Code, however, the legislature rejected such a change, requiring no corroboration, and providing only that "the jury shall be instructed to evaluate the testimony of a victim or complaining witness with special care in view of the emotional involvement of the witness and the difficulty of determining the truth with respect to alleged sexual activities carried out in private." Crimes Code, § 3106. Later, the legislature repealed even this provision, and the Crimes Code now provides:

> The credibility of an alleged victim [of rape] shall be determined by the same standard as in the alleged credibility of an alleged victim of any other crime. The testimony of a victim need not be corroborated.... In any prosecution before a jury ..., no instructions shall be given cautioning the jury to view the alleged victim's testimony in any other way than that in which all victims' testimony is viewed.
>
> Act of May 18, 1976, P.L. 120, No. 53, § 2, 18 Pa.C.S. § 3106.

It would be a mistake, however, to conclude from these similarities between the Crimes Code and the common law that in enacting the Crimes Code, the legislature simply intended to codify, in modern language, the common law definition of rape. For in certain respects the legislature

rejected the common law, and, following the lead of the Model Penal Code and the Proposed Crimes Code, took a fresh approach.

At common law, and under prior statutory law, rape was conceived in terms of the victim's refusal to consent to intercourse. *See, e.g., Commonwealth v. Moskorison,* 170 Pa.Super. 332, 85 A.2d 644 (1952) ("against her will" synonomous with "without her consent"). *And see Commonwealth v. Stephens, supra* (collecting authorities, and tracing our statutory law from 13 Edw. I, Stat.Westm., 2, c. 34 (1285), which provided "that if a man from henceforth do ravish a woman, married, maid, or other, where she did not consent, neither before nor after, he shall have judgment of life and of member. . . ."). While conviction required proof that the intercourse had been accomplished both "forcibly" and "against [the victim's] will," the emphasis of the inquiry was on the victim's refusal to consent, proof of the element of force being regarded as relevant to that refusal. This emphasis reflected the general attitude of the common law towards rape, summarized in Lord Hale's often-quoted remark that rape "is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent." 1 M. Hale, The History of the Pleas of the Crown 635 (1680), quoted in Note, Recent Statutory Developments in the Definition of Forcible Rape, 61 Va.L.Rev. 1500, 1501 (1975). As a result, the evidence would be found insufficient unless it appeared that the victim had offered a high degree of resistance; a frequently stated formula was that she must have resisted "to the utmost" of her physical capacity, and have persisted in that resistance until the intercourse was accomplished. *See generally,* Note, *supra* at 1503–08. If the compulsion was by threat of force, instead of by the actual application of force, then at common law, and under derivative statutory law, the threats had to be such as to excuse the victim from the duty of "utmost resistance." Thus it was said that the threats must have put the victim in "fear of death or great bodily harm," "fear of great personal injury," "fear and

terror so extreme as to preclude resistance." Model Penal Code (1980), Comment to § 213.1, at 308 (footnote and citations omitted).

Gradually, but with increasing momentum, it became apparent that the common law conception of rape was simply inadequate. The proven reluctance of victims to report rape, the dramatic increase in the incidence of the crime, and the low conviction rates for defendants [were] all indices of a law ... gone awry.

Note, *supra* at 15 (footnotes omitted). The fundamental flaws in the common law conception were summarized in the commentary to the Model Penal Code. In the first place, the common law oversimplified to the point of falsifying the victim's response to her situation, failing to recognize that the victim's failure to resist might be, not because she had consented to the intercourse, but because she was "frozen by fear and panic." Model Penal Code and Commentaries (Official Draft and Revised Comments) 1980, Comment to § 213.1, at 303. In addition, the common law demanded inordinately dangerous conduct on the part of the victim; resistance might invite death or serious bodily harm, and rather than risk either, she might "quite rationally decide[ ] to 'consent' to the intercourse." *Id.* And finally,

it is wrong to excuse the male assailant on the ground that his victim failed to protect herself with the dedication and intensity that a court might expect of a reasonable person in her situation. As a practical matter, juries may require resistance to show that the male compelled her to submit, but there is little reason to encase this generalization in a rule of law. Where the proof establishes that the actor did compel submission to intercourse by force, the failure of the weak or fearful victim to display "utmost" or even "earnest" resistance should not be exculpatory.

*Id.* at 305–06.

In recognition of the fundamentally flawed nature, and consequent inadequacy, of the common law, the American

Law Institute "determined that an essentially fresh approach should be undertaken." *Id.* at 279. The essence of this approach, as embodied in the Model Penal Code, was to define rape in terms of the actor's use of force, with no reference to the victim's refusal to consent. As the authors explained:

> By focusing upon the actor who "compels" the victim "to submit by force" and by omitting express language of consent and resistance, the Model Code casts away encrusted precedents and strikes a fresh approach. This is not to say that consent by the victim is irrelevant or that inquiry into the level of resistance by the victim cannot or should not be made. Compulsion plainly implies non-consent, just as resistance is evidence of non-consent. By the same token, the lack of resistance on a particular occasion will not preclude a conviction of rape if the jury can be convinced by the context and degree of force employed by the actor that the submission was by compulsion.

*Id.* at 306–07 (footnote omitted).

It was this "fresh approach" that our legislature followed when enacting the Crimes Code. It, too, "cast[ ] away encrusted precedents," rejecting the common law and the 1939 Penal Code's reference to intercourse "against the will" of the victim, and defining rape as being committed when a person

> engages in sexual intercourse with another person not his spouse:
>
> (1) by forcible compulsion;
> (2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;
>
> . . . .

18 Pa.C.S. § 3121.

When one recognizes that in enacting the Crimes Code, the legislature followed the Model Penal Code's "fresh approach", it becomes clear that the meaning of "forcible compulsion" is *not* limited to compulsion accomplished by force, or by threat of force, in the sense of "to do violence

to." For if rape could be proved only by evidence of violence, or threat of violence, the very questions would arise under the Crimes Code that arose at common law, and that led to the criticism and rejection of the common law, that is to say, the inquiry would continue to focus, instead of on the actor, on the victim: What violence was done to the victim? Was she beaten, for example, or choked? Was she threatened with death? The very essence of the Model Penal Code's, and the legislature's, rejection of the common law is that this should *not* be the inquiry—that while rape *can* of course be accomplished by violence, or threat of violence, it *also* can be accomplished by compulsion arising from something *less* than violence, or threat of violence.

Returning, then, to the question with which I started—which plain meaning of "force" did the legislature have in mind when it used the phrase "forcible compulsion" in the Crimes Code?—I have no hesitancy in concluding that the legislature did *not* mean force in the limited sense of "to do violence to", and *did* mean force in the more general sense of "to constrain or compel by physical, moral, or intellectual means or by the exigencies of the circumstances." Only this conclusion is consistent with the legislature's manifested agreement with the Model Penal Code that a "fresh approach" should be taken, and the focus of inquiry shifted away from the victim's consent to the actor's force.

Nor is this conclusion disturbed by reference to the changes the legislature made in the text of the Model Penal Code, when it enacted the Crimes Code, for examination will show that these changes were stylistic only, and did not affect the substantive rejection of the common law. It seems fair to say that the legislature regarded the Model Penal Code, and the Proposed Crimes Code, as, so to speak, "overwritten", and was of the opinion that their substance could be more briefly and simply expressed.

Thus, where the two Codes had provided for three grades of rape, the legislature provided for only one, thereby choosing to leave variations in severity of punishment to the discretion of the sentencing judge, instead of writing the

variation into the Crimes Code itself. The legislature took the same approach in enacting other parts of the Crimes Code, often reducing the number of grades provided by the Model Penal Code, with a consequent increase in the discretion of the sentencing judge. *See and compare* section 1203(a) Deviate Sexual Intercourse by Force (second degree felony) and section 1203(b) Deviate Sexual Intercourse by Other Imposition (third degree felony) *with* 18 Pa.C.S. § 3123 Involuntary Deviate Sexual Intercourse (first degree felony); section 1101(b) Kidnapping (first degree felony unless actor voluntarily releases victim alive prior to trial, in which case second degree felony) *with* 18 Pa.C.S. § 2901 Kidnapping (first degree felony); section 1402 Burglary (second or third degree felony) *with* 18 Pa.C.S. § 3502 Burglary (first degree felony).

A second simplification was the omission from the Crimes Code of the reference in the Model Penal Code, and the Proposed Crimes Code, to the offense of "gross sexual imposition." This simplification followed from the legislature's decision to provide only one grade of rape. In the Model Penal Code, and the Proposed Crimes Code, where three grades of rape were provided, it made sense to give a name, "gross sexual imposition", to the third grade. However, where only one grade was provided there was no reason for such labeling: the name of the one grade of offense—"rape"—included every situation in which the offense is committed.

And finally, a third simplification was the legislature's use of the word "forcible", in the phrases "forcible compulsion" and "by threat of forcible compulsion." Once it is determined to reject the common law, and shift the inquiry from the victim's consent to the actor's force, the question arises, "How much force must the actor apply, or threaten, to be guilty of rape?" The Model Penal Code answered this question by dividing rape into three grades, each grade being defined by an objective standard by which the actor's force is to be measured. If the actor compelled the victim to submit by the actual application of force ("compels her to

submit by force"), then the rape is at least a felony of the second degree. If in applying force, the actor "inflict[ed] serious bodily injury upon anyone", or if "the victim was not a voluntary social companion of the actor upon the occasion of the crime and had not previously permitted him sexual liberties," then the rape is a felony of the first degree. If the actor compelled the victim to submit by threat, then the rape is a felony of the first degree if the submission was compelled "by threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted on anyone," and of the third degree if compelled "by any threat that would prevent resistance by a woman of ordinary resolution." With slight differences, the Proposed Crimes Code is to the same effect. In enacting the Crimes Code, the legislature simplified this scheme, the simplification following upon the decision to provide only one grade of rape instead of three. Instead of distinguishing between compulsion by "force" and by "force" involving the "inflict[ion] [of] serious bodily injury", the legislature simply referred to "forcible compulsion", thus embracing in a single phrase both sorts of force. And instead of distinguishing between "threat of imminent death, serious bodily injury, extreme pain or kidnapping" and "threat that would prevent resistance by a woman of ordinary resolution", the legislature simply referred to "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution", thus again embracing in a single phrase the several situations separately stated in the Model Penal Code and Proposed Crimes Code.

It only remains to discuss amendments of the Crimes Code. I have already mentioned one of the amendments—the amendment providing that the credibility of the alleged victim "should be determined by the same standard as is the credibility of an alleged victim of any other crime," and that "no instructions shall be given cautioning the jury to view the alleged victim's testimony in any other way than that in which all victims' testimony is viewed." Act of May 18, 1976, P.L. 120, No. 53, § 2, 18 Pa.C.S. § 3106. As one

reflects upon this amendment, one is increasingly impressed with its importance. For the most striking feature of the common law was that the alleged victim was *not* treated by the standard that victims of other crimes were treated. To the contrary, she was discriminated against in many ways. The common law's concern was not for the woman so much as for the man. *See generally* Note, The Victim in a Forcible Rape Case: A Feminist View, 11 American Crim.L. Rev. 335 (1973) (collecting cases and commentaries). "The real victim," it was said, "too often is the innocent man." 3A J. Wigmore, Evidence 736 n. 6 (1970). The assumption was "that men are often unjustly imprisoned because of accusations brought by malicious women who all too often are afflicted with sexual and emotional problems." Note, *supra* at 336 (footnote omitted). In many cases, it was suggested, "the victim actually sets up the rape either consciously or unconsciously, .... [W]omen [it was asserted] are so inherently masochistic that rape may actually be a 'pleasurable event' or a 'liberating experience' ". *Id.* at 339 (footnote omitted). The following statement summarizes the attitude of the common law:

> Force and consent are the significant issues in rape trials. Many times a female will submit after a lot of talk, liquor, and lunges, and later, for a wide range of reasons, decide that she was really raped. Some girls rape awful easy. So many chicks say no no when there's yes yes in their eyes, and their thighs seem to spread at a mere flick of the finger. The rape law is often used by a woman to "get" a former boyfriend or a hoped-for boyfriend who never materialized.
>
> S. Rosenblatt, Justice Denied 36 (1971), quoted Note, *supra* at 335.

It was this attitude that rendered the common law inadequate to deal with rape, and that resulted in the Model Penal Code's rejection, followed by the Crimes Code's rejection, of the common law. The legislature's explicit provision, in 1976, that an alleged victim of rape was not to be regarded as probably untrustworthy and emotionally unbal-

anced, but instead was to be treated by the standard that alleged victims of other crimes were treated, can only be understood as an emphatic reiteration by the legislature of its determination, manifested by its enactment of the Crimes Code, that it should be easier to prove rape than it had been at common law.

The same may be said of the other amendments of the Crimes Code made by the Act of May 18, 1976, *supra.* Section 1 of the Act provided that

> Prompt reporting to public authority is not required in a prosecution [for rape]: Provided, however, That nothing in this section shall be construed to prohibit a defendant from introducing evidence of the alleged victim's failure to promptly report the crime if such evidence would be admissible pursuant to the rules of evidence.

18 Pa.C.S. § 3105.

Section 2 of the Act provided that

> The alleged victim need not resist the actor in prosecutions [for rape]: Provided, however, That nothing in this section shall be construed to prohibit a defendant from introducing evidence that the alleged victim consented to the conduct in question.

18 Pa.C.S. § 3107.

(This amendment repealed the provision in the Crimes Code, which had been taken from Section 213.6 of the Model Penal Code, that no prosecution could be instituted or maintained unless complaint was made within three months.) And finally, Section 1 of the Act further provided that

### § 3104. Evidence of victim's sexual conduct

**(a) General rule.**—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

**(b) Evidentiary proceedings.**—A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

1972, Dec. 6, P.L. 1482, No. 334, § 1, effective June 6, 1973. As amended 1976, May 18, P.L. 120, No. 53, § 1, effective in 30 days.

18 Pa.C.S. § 3104.

Thus, each of the 1976 amendments of the Crimes Code removed an obstacle to the proof of rape, thereby further advancing the legislature's determination that the alleged victim of a rape should be treated as the alleged victim of any other crime. The last-mentioned amendment is perhaps of particular significance. Experience with the common law had shown that a principal tactic of defense counsel was to attack the alleged victim's chastity, the suggestion being that if she had had prior sexual relations she was a bad person. The result was summarized by one trial judge, in a statement to a jury that had just acquitted a defendant charged with rape:

It is almost impossible in this country to get a conviction of rape.... I am reluctantly coming to the conclusion ... [that] at least as far as jurors are concerned, rape is no longer a crime.... [I]nstead of trying the defendant, you make the poor girl the defendant.... [G]irls don't report rape for the humiliation involved in it, the degradation they go through in the trial.... They are made the defendant, and they walk out of this court room with one thought in their mind: In our courts there is no justice for the victims of rape. And I can't say I disagree with them.

Quoted in Note, Recent Statutory Developments in the Definition of Forcible Rape, *supra* at 1500.

By limiting evidence of the alleged victim's past sexual conduct to evidence of conduct with the defendant where consent is at issue, the legislature sought to counter the humiliation and degradation so often inflicted upon the alleged victim.

Strictly speaking, it is perhaps not necessary to consider the 1976 amendments of the Crimes Code, for as discussed above, when the Crimes Code is examined in the light of its several sources—prior common and statutory law, the Model Penal Code, and the Proposed Crimes Code—its meaning is clear. Nevertheless, consideration of the 1976 amendments is useful, for the amendments confirm, and emphasize, that meaning. It is as though the legislature said, in 1976: "In 1972, when we enacted the Crimes Code, we were determined to reject the common law, and to make proof of rape easier. Now we find we did not go far enough. Women still are not being treated fairly. We therefore now enact these amendments."

In conclusion, then: Appellant's argument that the evidence was insufficient depends upon the fact that the evidence fails to show either that he did, or threatened to do, any violence to the complainant. Were this prosecution a prosecution at common law, this argument would prevail. However, it is a prosecution under the Crimes Code, which rejects the common law and only requires that the evidence show that the complainant submitted to appellant's demands because he made such a "threat of forcible compulsion [as] would prevent resistance by a person of reasonable resolution." By "forcible compulsion" the legislature meant "compulsion by physical, moral, or intellectual means or by the exigencies of the circumstances." By this standard, the evidence, viewed in the light most favorable to the Commonwealth, was sufficient. Appellant threatened the complainant, a 14 year old girl, with being returned to the detention home, and with not seeing her father again. Complainant was afraid of going back to the detention

home. Her father and brother, with whom she had been living, had filed charges against her, with the result that she had spent three days there, and then been placed in appellant's home by court order. I believe that the jury was entitled to find that the complainant was compelled to submit to appellant's demands by the exigencies of her circumstances, and, further, that in submitting, she acted as a person of reasonable resolution.[2]

Resisting this conclusion, appellant relies heavily on, and the majority cites with approval, *Commonwealth v. Biggs*, 320 Pa.Super. 265, 467 A.2d 31 (1983). In *Biggs* the defendant had sexual intercourse, over a period of two years, on several occasions with his 17 year-old daughter. She complied because her father told her that the Bible said it was the oldest daughter's duty to have intercourse with her father when the mother could no longer provide as a mother. He also told her that if she told anyone, he would show nude pictures of her. He never did any violence to her, nor did he threaten to do so. We reversed the defendant's conviction of rape, holding that there was "no evidence that the intercourse was accomplished through threat of forcible compulsion.... Rather, [the defendant] asserted a biblical basis for the intercourse and assured his daughter's silence by threats, not of force, but of humiliation." *Id.*, 320 Pa.Superior Ct. at 267, 467 A.2d at 32. To the extent that *Biggs* holds that threats of humiliation are insufficient as a matter of law to constitute a threat of forcible compulsion, it should be overruled.

2. The differences between the foregoing interpretation of the Crimes Code and the majority's interpretation are instructive. In my view, the majority's interpretation of the Crimes Code continues to keep women in a position subordinate to men: a woman's testimony in a rape case that she was compelled to submit is not to be trusted; she must be able to prove that the man used physical force. Neither, in the majority's view, is a jury to be trusted: Although the Crimes Code requires that in submitting, the woman must have acted as a woman of reasonable resolution, a jury cannot be relied upon to apply this standard; instead it will convict as a rapist one who was only a seducer. It is, I suggest, those differing convictions, regarding a woman's appropriate status and a jury's competence and appropriate function, that underlie the majority's and my differing interpretations of the Crimes Code.

Some other cases should be noticed. In *Commonwealth v. Irvin*, 260 Pa.Super. 122, 393 A.2d 1042 (1978), we said that

> the degree of force involved in rape and involuntary deviate sexual intercourse is defined, not in terms of the physical injury to the victim, but in terms of the effect it has on the victim's volition. Both crimes are committed when the actor accomplishes the crime "by forcible compulsion" or "by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." 18 Pa.C.S. § 3121(1), (2); § 3123(1), (2). The force necessary to support convictions for rape and involuntary deviate sexual intercourse need only be such as to establish lack of consent and "to induce a woman to submit without additional resistance...." *Commonwealth v. Moskorison*, 170 Pa.Super. 332, 336, 85 A.2d 644, 646 (1952). As one court has noted, "The degree of force required to constitute rape is relative depending upon the particular circumstances. Actual application of force is not required." *Commonwealth v. Steele*, 75 Dauph. 241, 246 (1960).

*Id.*, 260 Pa.Superior Ct. at 125–26, 393 A.2d at 1044. This language, it will be observed, is consistent with the conclusion I have reached, that "forcible compulsion" is not limited to compulsion by violence or threat of violence. However, I have not relied on it, and therefore have not mentioned it until now, for in *Irvin* the defendant had torn off the victim's clothes and started choking her. Thus, he did in fact do violence, and we were not required to decide whether if he had not, there would have been "forcible compulsion." The same is true of *Commonwealth v. Williams*, 294 Pa.Super. 93, 439 A.2d 765 (1982), and *Commonwealth v. Rough*, 275 Pa.Super. 50, 418 A.2d 605 (1980). In *Williams* the defendant and the victim were strangers. He offered to give her a ride and then changed direction, bolting the door and keeping his hand in his pocket, repeatedly threatening to kill her. The victim testified that she thought that he had a weapon. While our opinion does

not mention it, since the threats were of death, this case clearly involved a threat to do violence. Similarly, in *Rough* the defendant was the 15 year old victim's stepfather. He struck her on the occasion of the rape and otherwise treated her forcibly. We said that "the victim's testimony as to her fear and appellant's forceful treatment of her demonstrated sufficient lack of consent to sustain the verdict." *Id.*, 275 Pa.Superior Ct. at 57, 418 A.2d at 608.[3]

Finally, I am constrained to comment upon the majority's reliance upon *Commonwealth v. Perrin*, 484 Pa. 188, 398 A.2d 1007 (1979). The majority cites *Perrin* as its sole case law support for the proposition that "the highest court of this Commonwealth [has expressed the view] that 'forcible compulsion' is equivalent to 'physical compulsion' rather than 'psychological duress.'" At 281; *see id.* at 286. The majority acknowledges that the Supreme Court's statement that "[t]he crime of involuntary deviate sexual intercourse is committed when a person forces another person by actual physical compulsion or threats thereof to engage in acts of anal or oral intercourse" is *"dictum* in view of the facts of the case." At 281. But the majority does not acknowledge how different the facts in *Perrin* were from those here. In *Perrin* the victim was found strangled to death. Thus, the Court did not have before it, and therefore did not consider, whether rape can occur without the application of physical force. It is not at all surprising that the Court referred to "actual physical compulsion", for there was no doubt that the victim had indeed been subjected to "actual physical compulsion."

**3.** As mentioned, appellant was also charged with, and convicted of, attempted rape and involuntary deviate sexual intercourse, and his argument that the evidence was insufficient extends to those convictions, as well as to his conviction of rape. His argument may be rejected summarily, however, for in defining involuntary deviate sexual intercourse, the Crimes Code provides that the offense is committed when the intercourse is accomplished "by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." 18 Pa.C.S. § 3123(2). Accordingly, the preceding discussion of the meaning of this language as used in the definition of rape is applicable.

From the fact that the victim was found strangled to death on her bed with her legs spread apart, her clothing torn from her body, spermatozoa in her vagina and tears on the wall of her rectum, the jury could have found beyond a reasonable doubt that she had been sexually assaulted and forcibly sodomized.

484 Pa. at 192–93, 398 A.2d at 1010.

I suggest, therefore, that the dictum in *Perrin,* even as dictum, in no way supports the majority's position.

–2–

Appellant also argues that even if the evidence was sufficient to show "forcible compulsion", still, the trial court's instruction to the jury was inadequate in failing to explain the meaning of "forcible compulsion." I agree with appellant, although since appellant's conviction of rape is to be reversed, my comments are rather academic.

The trial court's statement of the elements of rape was in accordance with the Pennsylvania Standard Jury Instructions, 15.3121A. N.T. 1/22/82, 72. In discussing the evidence, however, the court stated, "Now, in that respect the compulsion, as I believe the testimony would show, would be the threat of return to the detention home." N.T. 1/22/82, 73. This statement could have been understood by the jury in two ways: as saying only that the testimony pertaining to compulsion was the testimony that appellant had threatened to return the complainant to the detention home, that is, as only reminding the jury of the evidence; or as saying that the court itself was of the opinion that the testimony showed that the victim was actually compelled by the threat, and perhaps also as implying that it was reasonable for her to have responded in the way that she did. Given the central importance to this case of whether there had or had not been a threat of forcible compulsion such as would prevent resistance by a person of reasonable resolution, this ambiguity may not be overlooked. A trial judge may

express his own opinion, including the weight and effect to be given the evidence and its points of strength and weakness, *provided that* the statements he makes have a reasonable basis and it is clearly left to the jury to decide the facts, regardless of any opinion expressed by the judge. *Williams v. Philadelphia Transportation Co.,* 415 Pa. 370, 203 A.2d 665 (1964); *Commonwealth v. Collura,* 183 Pa.Super. 17, 128 A.2d 101 (1956).

*Commonwealth v. Rough, supra,* 275 Pa.Super. at 60, 418 A.2d at 610 (emphasis added).

Here, the proviso was not satisfied. For while the trial court had a reasonable basis for thinking that the evidence proved a sufficient threat of forcible compulsion, its instruction did not clearly leave that determination to the jury.

In making this observation, I am mindful that the court's instruction to the jury must be read as a whole to determine whether it was fair and not prejudicial, adequately and accurately stated the law, and was sufficient to guide the jury. *Commonwealth v. Peterson,* 271 Pa.Super. 92, 412 A.2d 590 (1979). Here, read as a whole, the instruction told the jury that "you are the finders of fact and you must make these various determinations and apply them to the law as I have indicated." N.T. 1/22/82, 72. One of the "various determinations" thus mentioned was whether the complainant had submitted to appellant's demands as the result of such a "threat of forcible compulsion [as] would prevent resistance by a person of reasonable resolution." I have just referred to the court's ambiguous comment on the evidence of compulsion as possibly interfering with that determination. If, however, that possibility is put aside, still the court's instruction was inadequate, for it offered no guidance to the jury on the meaning either of "forcible compulsion" or of "a person of reasonable resolution." Instead, the trial court instructed the jury only in the language of the statute. Thus, the jury was twice told that the intercourse needed to be accomplished by a "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." N.T. 1/22/82, 71, 72.

When instructing on involuntary deviate sexual intercourse, the trial court once said, "threat of forcible compulsion that would prevent resistance," and another time said, "accomplished the deviate sexual intercourse by either forcible compulsion or threat of forcible compulsion." N.T. 1/22/82, 75.

On the new trial that I should order the jury would be instructed in terms consistent with this opinion. Thus the trial court would be required to explain that "forcible compulsion" means "compulsion by physical, moral, or intellectual means or by the exigencies of the circumstances." Since this language is itself somewhat abstract, and might seem to the jury rather high-flown, the trial court might elaborate upon, or illustrate, it by appropriate reference to the evidence. That would be left to the trial court's sound discretion.

On the new trial I should order the jury would also be instructed how to determine how a "person of reasonable resolution" would behave, and who a "person of reasonable resolution" is. The instruction that was given included no explanation of the importance of the jury's function in this regard. The trial court should have made clear that "reasonable resolution" is an objective standard, so that the jury understood that even if it found the complainant credible, that was not the end of its inquiry. Again, I should leave to the trial court's sound discretion to what extent on retrial reference to the evidence may be appropriate. However, it seems probable that some reference would be needed, if the jury were to understand that "a person of reasonable resolution" is a person in the situation of the complainant, so that in deciding whether the complainant manifested "reasonable resolution", factors such as her age and the circumstances of her commitment to and release from the detention home will be considered by the jury. Thus, for example, in a different case, factors to be considered might be that the complainant was in an isolated place, *see Commonwealth v. Bowes,* 233 Pa.Super. 71, 335 A.2d 718 (1975), or had been beaten by the defendant on prior occasions, *see*

*Commonwealth v. Rough, supra,* or was confronted with a friend of the defendant of whom she was more afraid, *see Commonwealth v. Brown,* 290 Pa.Super. 448, 434 A.2d 838 (1981). Another factor the trial court might think it appropriate to comment on would be the nature of the compulsion alleged, for that might well bear upon the jury's evaluation of complainant's conduct. Evidence of actual violence will ordinarily be the easiest for a jury to evaluate: the victim may have scars from having been beaten, for example. Evidence of compulsion by threat may be more difficult to evaluate, however, and especially is this likely to be the case where the threat is—as it was here—of something other than violence. For such a threat will have a variable impact upon the person threatened. While none of us would wish to be killed or seriously hurt, we might react with different intensities to a threat such as a threat to be returned to a detention home. The trial court should, in an appropriate manner, as indicated by the evidence, give the jury guidance in these respects, making clear, not only that the threat must have been such as to cause a reasonable person to submit, but that the threat must actually have compelled the particular complainant to have submitted. Even in the face of a threat of death, which would cause a reasonable person to submit, if the complainant knows that the defendant is not serious and really means her no harm, any ensuing sexual intercourse cannot be rape.

The trial court's instruction on involuntary deviate sexual intercourse also requires consideration, although since, contrary to my view, appellant's conviction of that crime will be affirmed, here too my comments are academic so far as disposition of this case is concerned. As I have mentioned, when discussing the sufficiency of the evidence, *see* note 3, *supra,* the definition of involuntary deviate sexual intercourse includes the phrase "by threat of forcible compulsion that would prevent resistence by a person of reasonable resolution." 18 Pa.C.S. § 3123(2). Accordingly, jury instructions on the definition of involuntary deviate sexual intercourse should be consistent with the comments just

made regarding instruction on the definition of rape. I note, however, that a defendant such as appellant may be convicted of involuntary deviate sexual intercourse without a showing of "forcible compulsion." This is so because subsection 5 of Section 3123 of the Crimes Code provides that a person commits involuntary deviate sexual intercourse "when he engages in deviate sexual intercourse with another person ... who is less than 16 years of age," 18 Pa.C.S. § 3123(5)—as the complainant in this case was. Subsection 5 was specifically listed on the criminal complaint in this case, and the information specifies that the victim was fourteen. It is not at all clear why the Commonwealth did not request that the jury be instructed in accordance with subsection 5.

–3–

Appellant also argues that the trial court should have arrested judgment on the convictions on the two counts of indecent exposure "in that those two verdicts [of guilty] encompassed the same criminal conduct as the two convictions of Involuntary Deviate Sexual Intercourse[.]" Brief for Appellant at 7. Since I should hold that a new trial must be held on the charges of involuntary deviate sexual intercourse, I do not consider this argument. Appellant has not otherwise challenged his convictions of indecent exposure. However, I believe the judgments of sentence imposed on those convictions should be vacated. The Sentencing Code does not provide for a suspended sentence. *See* 42 Pa.C.S. § 9721(a); *Commonwealth v. Ferrier*, 326 Pa.Super. 331, 473 A.2d 1375 (1984) (indefinitely suspended sentence not a sanctioned sentencing alternative). The sentences imposed were suspended sentences and as such, were illegal, a fact that we may notice *sua sponte*. *Id.* *See Commonwealth v. Brown*, 290 Pa.Super. 448, 434 A.2d 838 (1981). *But see Commonwealth v. Goldhammer*, 507 Pa. 236, 248 n. 5, 489 A.2d 1307, 1313 n. 5 (1985) (double jeopardy effect of suspended sentence).

The sentences imposed on four of the five counts charging appellant with corrupting the morals of a minor were

also suspended sentences. They therefore also should be vacated and the case remanded for resentencing on the one remaining count.

–4–

Appellant's last argument is that the trial court abused its discretion in ruling that the complainant was competent to testify. This argument is without merit.

It is well settled that the competency of a witness is presumed and the burden to show incompetency falls upon the party asserting it. *Commonwealth v. Riley*, 458 Pa. 390, 393, 326 A.2d 384, 385 (1974). When the witness is a child under the age of fourteen years, the trial judge should be satisfied that the witness has

"(1) such capacity to communicate, including as it does both an ability to understand questions and to frame express and intelligent answers; (2) mental capacity to observe the occurrence itself and the capacity of remembering *what it is* that [the witness] is called to testify about; and (3) a consciousness of the duty to speak the truth."

*Rosche v. McCoy*, 397 Pa. 615, 620, 156 A.2d 307, 310 (1959) (emphasis in original). See also *Commonwealth v. Baker*, 466 Pa. 479, 485, 353 A.2d 454, 457 (1976). The determination of competency is a matter for the sound discretion of the trial court, which will not be disturbed absent a clear abuse of that discretion. *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974). Accord, *Commonwealth v. Martinez*, 498 Pa. 387, 446 A.2d 899 (1982).

*Commonwealth v. Hart*, 501 Pa. 174, 177, 460 A.2d 745, 747 (1983).

Here, the complainant was not under fourteen years of age. Nevertheless, the trial court examined her *in camera* before ruling on her competency. N.T. 1/21/82, 113–24. On the basis of our review of the questioning of her by the trial court and counsel, I am satisfied that in ruling her competent, the trial court did not abuse its discretion. The

reasons advanced by appellant in challenging the complainant's competency go not to competency but credibility.

WICKERSHAM, J., joins this Opinion.

JOHNSON, Judge, dissenting:

In my view, the judgments of sentence should be affirmed. Hence, this dissent.

I join in the statement of the case and the issues presented, as well as the recitation of the facts, contained in the Dissenting Opinion of my distinguished colleague, President Judge SPAETH. I also join in the conclusion set forth in Judge Spaeth's Dissent that "threat of forcible compulsion" is not limited to threats of physical violence. I therefore conclude that the first issue on this appeal, the sufficiency of the evidence to establish the crimes of rape and attempted rape, must be resolved in favor of the Commonwealth.

The majority, having determined that the convictions of rape and attempted rape must be reversed and set aside, does not reach the second issue raised by Appellant, that the trial court's instruction to the jury was inadequate. Judge Spaeth has considered the issue, and would agree with Appellant that the instruction was legally insufficient in failing to explain the meaning of "forcible compulsion." On this issue, I must respectfully disagree with Judge Spaeth.

The question presented by Appellant in his brief is:

2. Whether the Court should grant a new trial to Appellant in that the Court's instruction as to the definition of Forcible Compulsion or Threat of Forcible Compulsion was legally insufficient?

Brief for Appellant at 8.

Both the trial transcript and Appellant's brief are clear that Appellant took exception only to the sufficiency of the *evidence* to support a charge of rape. Appellant did not challenge the trial court's *charge* as being either "confusing" or "inadequate."

At the completion of the charge, defense counsel requested, and was granted, an additional charge on the separate, possible verdicts that could be returned as to each of the counts in the information. N.T. 1/22/82 at 96–99. Defense counsel then entered the following specific exception on the record:

MR. GLEASON: I have one specific exception. For the record, we would specifically except to the points of charge that have already been refused by the Court. *We would except* at this time *to the submission of the questions of rape*, the three counts, *and indeed the two counts of involuntary deviate sexual intercourse and on the grounds that as a matter of law the forcible compulsion element has not been satisfied by the characterization of a threat to return the girl to the detention home as constituting a criminal threat that satisfies the requirement. And accordingly, since that is a part of the corrupting the morals and the wrecklessly [sic] endangering, the same type of exception applies to those sections also, Your Honor.*

THE COURT: I am going to deny that, I think that it is for the jury to make that determination. I am going to send out the joint exhibit No. 1, and the Defendant's exhibit No. 2.

(Whereupon, the sidebar discussion was concluded.)

THE COURT: All right, members of the jury, take the case, give it your complete consideration and with the hope of arriving at a verdict.

(Whereupon, the jury left the courtroom to deliberate at 3:10 p.m.)

*Id.*, at 99–100.

By this exception, counsel sought to contend that Appellant's threat to return the victim to the detention home, if she did not submit to his demands, did not constitute a criminal threat cognizable under the rape statute. It is precisely this point which Judge Spaeth rejects in Section 1 of his Dissent. I concur with that rejection.

In his brief, Appellant argues:

Despite the fact that Judge Creany's instructions seem to be in conformity with the [Pennsylvania Suggested Standard Criminal Jury Instructions], defendant contends that they were missapplied [sic] to the facts of this case. "The threat of return to the detention home" does not constitute force in connection with a sexual crime. Since no other type of force was mentioned in the charge nor any testimony regarding the use or threat of force was propounded, it seems obvious that Judge Creany was relying on defendant's statement as the sole basis for instructing the jury on the issue of forcible compulsion or threat thereof. . . . Moreover, Judge Creany failed to amplify and explain forcible compulsion to the jury and he failed to state that each individual act required an act of "forcible compulsion" or a "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution."

Appellant's counsel maintains Judge Creany's instructions are legally inadequate in this case.

Brief for Appellant at 25.

It is clear that Appellant takes issue with the conclusion I would reach that forcible compulsion is not limited to compulsion by violence. His present claim that the trial court failed to amplify and explain forcible compulsion to the jury must be rejected, however. Appellant's Requested Points for Charge did not include a request for any amplification or explanation as to the meaning of forcible compulsion.

My reading of the entire charge persuades me that it was, in fact, legally sufficient. I do not find the ambiguities which are apparent to Judge Spaeth, nor did Appellant cite to these so-called ambiguities in his appeal to this Court. His objection to the charge did not recognize, and was made without reference to, the ambiguities. Appellant objected to the charge because it did not state his theory of the law. By insisting on his mistaken point, Appellant failed to alert the court to the possible error that Judge Spaeth now considers *sua sponte*. Since Appellant's objections at the conclusion of the charge were specific as to

other matters, with no reference to the adequacy of the charge on legal compulsion, the objection—if any—has been waived. *Commonwealth v. Frank*, 263 Pa.Super. 452, 466, 398 A.2d 663, 670 (1979), and cases cited therein.

Accordingly, I would reject the second contention raised by Appellant as to the legal sufficiency of the charge on forcible compulsion.

With respect to Appellant's third issue, that the convictions of indecent exposure should merge with the convictions of involuntary deviate sexual intercourse, I find his contentions to be wholly without merit. Appellant received sentences of imprisonment at the Cambria County Jail on the convictions for rape, attempted rape, corrupting the morals of a minor, and involuntary deviate sexual intercourse. In the aggregate, his imprisonment is a minimum of three years and a maximum of eight years. Appellant contends only that the trial court erred in refusing to arrest judgment or to merge the guilty verdicts as to indecent exposure.

At sentencing, the distinguished trial judge announced:

The two cases that remain, both addressing itself to indecent exposure, as you recall, initially when I started the sentencing process, I indicated to you that these were incorporated in the charges of involuntary deviate sexual intercourse.

So, the sentence on the first count of C–0448(d), the Defendant, Joseph Mlinarich is ordered to:

1. Pay the costs of prosecution.
2. Further sentence is suspended.

The second count of C–0448(d), the Defendant Joseph Mlinarich is ordered to:

1. Pay the costs of prosecution.
2. Further sentence is suspended.

Now, the effect of the sentencing which I have imposed is you will have three years of jail time with eight years

of extended time and all service of the incarceration will be in the Cambria County Jail.

Sentencing Proceedings, 10/19/82 at 30.

The short answer to Appellant's contention is that a merger issue cannot arise unless and until sentences of imprisonment have been imposed on the charges for which merger is sought. Here, Appellant was never sentenced to undergo imprisonment on either of the charges involving indecent exposure. The sentence cannot be modified or merged. Since I find the issue to be without merit, I take no position on the "illegality" of a suspended sentence.

The fourth issue seeks to challenge the competency of the fourteen-year-old complainant to testify. I join in Section 4 of Judge Spaeth's Dissenting Opinion which finds no error in the trial court's ruling that the victim was competent to testify.

Based upon all of the foregoing, I would affirm the judgments of sentence.