· 542 A.2d 1335

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Joseph MLINARICH, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 22, 1987.

Decided May 26, 1988.

248

Timothy Creany, Dist. Atty., Dennis M. McGlynn, Asst. Dist. Atty., Ebensburg, for appellant.

Ann C. Lebowitz, Asst. Dist. Atty., Gaele McLaughlin Barthold, Chief–Prosecution, for amicus curiae, Philadelphia Dist. Atty.

Robert D. Gleason, Johnstown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## ORDER

PER CURIAM:

The Court being equally divided, it is ordered as follows:

The order of the Superior Court is affirmed.

HUTCHINSON, former J., did not participate in the consideration or decision of this case.

NIX, C.J., files an Opinion in Support of Affirmance in which FLAHERTY and ZAPPALA, JJ., join.

LARSEN, J., files an Opinion in Support of Reversal in which PAPADAKOS, J., joins.

McDERMOTT, J., files an Opinion in Support of Reversal.

## OPINION IN SUPPORT OF AFFIRMANCE

NIX, Chief Justice.

In the instant appeal we have agreed to consider the Commonwealth's contention that the threats made by an adult guardian to a fourteen year old girl to cause her to be recommitted to a juvenile detention facility supplies the "forcible compulsion" element of the crime of rape. For the reasons that follow, we are constrained to conclude that they do not and that the appellee's convictions of rape[1] and attempted rape[2] may not be permitted to stand.

The facts of the instant matter are no longer open to dispute. Immediately prior to the events which culminated in the rape and attempted rape charges under consideration herein, the complainant was living with her brother Gary and his wife and child in one-half of a double house in Vintondale, Cambria County. The complainant's father and her other siblings resided in the other half of the house; her mother was apparently institutionalized during the time of the relevant occurrences in this matter. When a diamond ring belonging to his wife disappeared, Gary asked the complainant if she had taken it, which she admitted. She asserted, however, that she had "lost" the ring, which prompted Gary to file criminal charges against her to teach her a lesson, apparently believing that the experience would lead to the recovery of the ring. As a result, the complainant was committed by court order to the custody of the Cambria County Detention Home.

1. 18 Pa.C.S. §§ 3121(1)–(2).
2. 18 Pa.C.S. § 901.

Appellee, Joseph Mlinarich, lived with his wife, mother and sister two doors from the home of the complainant's father. Appellee was sixty-three years old and suffered from emphysema and heart trouble. He was retired but his wife, who was considerably younger, worked as a nurse's aide. Appellee and his wife had known the complainant's family for approximately six years, and the complainant had done housework for appellee's wife. After the complainant was committed to the detention home, appellee's wife suggested that the complainant live with her and appellee. The complainant's father considered this to be an acceptable arrangement, and, after a juvenile hearing, the complainant was released into the custody of appellee's wife pending further proceedings.

On May 28, 1981, the complainant's fourteenth birthday, she and appellee were watching television in the living room. Appellee told her to remove her outer garments and sit on his lap. She complied, and appellee fondled her for approximately four minutes, during which time the victim "told him he shouldn't do that...." RR. 145. Appellee engaged in similar conduct towards the complainant "[a] couple times a week," RR. 147, over her protestations, desisting only if she began to cry. Appellant's wife was always out of the house during these and subsequent episodes.

In mid and late June of 1981, the perverse character of appellee's unwanted attentions escalated. During one incident, which led to a charge of attempted rape, appellee asked the victim to disrobe and, when she did not remove her bra and under garments, he ordered her to undress completely. When she refused, appellee threatened to send her back to the detention home if she did not comply. The complainant obeyed, and appellee removed his clothing. When she insisted that she "did not want to do anything," RR. 154, appellee repeated his threat to "send [her] back." RR. 155. Appellee then proceeded with an unsuccessful attempt at penetration, during which the complainant experienced pain and "scream[ed], holler[ed]" and cried. RR.

157. A similar encounter on June 19, 1981, resulted in a second charge of attempted rape. Appellee, in yet another attempt to achieve penetration, finally succeeded on June 26, 1981.

Appellee also successfully engaged the complainant in oral intercourse on June 29 and July 1, 1981. The same threat was repeated on those occasions. Finally, on July 2, 1981, when appellee "asked [her] to do that again, and [she] wouldn't," RR. 171, appellee engaged in verbal abuse of the victim which convinced her to leave appellee's home and report his reprehensible conduct to her father.

Appellee was subsequently arrested and charged with rape as well as multiple counts of attempted rape, involuntary deviate sexual intercourse, corruption of a minor, indecent exposure, and endangering the welfare of a minor. After a jury trial in the Court of Common Pleas of Cambria County appellee was convicted of all charges. His post-verdict motions were denied with the exception of his challenge to the counts of endangering the welfare of a minor, which were subsequently vacated. Appellee was sentenced to an aggregate term of three to eight years' imprisonment in the county jail.[3]

Appellee took a direct appeal to the Superior Court, which, after considering *en banc* the issues raised, reversed the rape and attempted rape convictions, affirmed the involuntary deviate sexual intercourse and corrupting the morals of a minor convictions, and vacated the sentences imposed on the indecent exposure convictions.[4] *Commonwealth v.*

3. Appellee was sentenced to consecutive one to three year terms on one count each of rape and involuntary deviate sexual intercourse, and to a one to two year consecutive term on one count of corruption of a minor. Separate one to three year terms on two counts of attempted rape were to be served concurrently with the rape sentence. Sentence was suspended on the remaining convictions. The sentencing court designated the county jail as the place of incarceration in view of appellee's age and health and to permit regular treatment by appellee's personal physician.

4. As a result of the Superior Court's ruling, the term of imprisonment was reduced from the three (3) to eight (8) years imposed by the trial

*Mlinarich*, 345 Pa.Super. 269, 498 A.2d 395 (1985). Four members of the nine-judge panel dissented and would have affirmed the rape and attempted rape convictions. *Id.*, 345 Pa.Superior Ct. at 288, 498 A.2d at 404 (Spaeth, P.J., dissenting, joined by Wickersham, J.), 345 Pa.Super. at 320, 498 A.2d at 421 (Johnson, J., dissenting); 345 Pa.Super. at 288, 498 A.2d at 404 (Popovitch, J., concurring and dissenting). Both the Commonwealth and appellee responded by filing petitions for allowance of appeal in this Court. After full consideration, appellee's petition was denied; the Commonwealth's petition for allowance of appeal was granted. 512 Pa. 115, 516 A.2d 299 (1986). The prosecution's appeal having been allowed, the matter has been ably briefed and argued and is now ripe for resolution.

I.

■■ Much of the confusion in this matter has resulted from the attempt to focus upon the words "forcible compulsion" out of the context in which it was used by the legislature. When viewed in proper context, the meaning of the phrase at issue becomes clear and the legislative scheme readily apparent. For the reasons that follow, we conclude that the term "forcible compulsion" includes both physical force as well as psychological duress. We are constrained to reject the contention that "forcible compulsion" was intended by the General Assembly, in this context, to be extended to embrace appeals to the intellect or the morals of the victim.

Section 3121 of the Crimes Code has made it a felony of the first degree where:

**Rape**

A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

  (1) by forcible compulsion;

court to a term of two (2) to five (5) years imprisonment. The decision entered this day leaves the latter sentence undisturbed.

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent.

18 Pa.C.S. § 3121.

The General Assembly has also established under section 3123 a felony of the first degree where one engages in involuntary deviate sexual intercourse under these circumstances:

**Involuntary deviate sexual intercourse**

A person commits a felony of the first degree when he engages in deviate sexual intercourse with another person:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious;

(4) who is so mentally deranged or deficient that such person is incapable of consent; or

(5) who is less than 16 years of age.

18 Pa.C.S. § 3123.

Instantly apparent is that the treatment of the two types of conduct were intended to be treated identically with the exception that section 3123 has the addition of subsection (5) which addresses the minority of the victim. However, the complete picture is furnished by section 3122.

**Statutory Rape**

A person who is 18 years of age or older commits statutory rape, a felony of the second degree, when he engages in sexual intercourse with another person not his spouse who is less than 14 years of age.

18 Pa.C.S. § 3122.[5]

---

**5.** At common law the age of consent was ten years. Engaging in intercourse with a female child under that age was conclusively presumed to be nonconsensual and against her will. *E.g., Commonwealth v. Exler,* 243 Pa. 155, 89 A. 968 (1914); *Commonwealth v. Stephens,* 143 Pa.Super. 394, 17 A.2d 919 (1941); *Commonwealth ex*

Section 3122 supplies to the scheme of punishment for forcible sexual intercourse that facet which is provided for in involuntary deviate sexual intercourse under subsection (5) of section 3123. It is clear that the legislature did consider the impact that should be given the minority of these victims of sexual assaults and specifically provided for it. Thus the arguments raised by the Commonwealth based upon the age of the victim in this appeal can only be considered as provided for under the statutory provisions in question. The courts may not through judicial gloss attempt to either enhance or diminish the consequences the legislature has expressly established for that factor.

The legislative intent to treat assault involving sexual intercourse whether deviate or not in the same fashion except for the minority of the victim is clear. Having made a judgment that deviate sexual intercourse is more offensive when committed upon a minor victim, that concern was addressed by providing that the offense would be a felony of the first degree, without regard to whether submission was compelled or consented to, if the victim was under the age of sixteen. In contrast, a sexual assault under section 3121 does not reflect an intent to accommodate the minority of the victim. Rather, the General Assembly deemed it appropriate to protect this societal interest under section 3122 by defining a felony of the second degree for engaging in sexual intercourse even though consensual if that victim

rel. *Case v. Smith,* 134 Pa.Super. 183, 3 A.2d 1007 (1939); 3 Co. *Inst.* 60. *See generally* R. Perkins, Criminal Law 111 (1957). Under our Penal Code of 1939 the presumptive level was raised to the age of sixteen years. Act of 1939, P.L. 872, § 721, 18 P.S. § 4721. Intercourse with a female child between the ages of 10 and 16 years was presumed nonconsensual unless it could be established that the "woman child" was not of good repute, in which event the defendant would be acquitted of the crime of rape and convicted of fornication. *Id.; Commonwealth v. Bonomo,* 396 Pa. 222, 151 A.2d 441 (1959); *Commonwealth v. Kester,* 58 Pa.Super. 509 (1914); *Commonwealth v. Howe,* 35 Pa.Super. 554 (1908). In considering the importance of the minority of the victim to the legislative scheme incorporated in our present Crimes Code it is to be noted that the present act reduced the presumptive age rather than maintain or increase the former age of 16 years for sexual intercourse. Where the sexual contact is deviate sexual contact, the General Assembly has conclusively presumed a lack of consent where the victim is under the age of 16 years.

was under the age of fourteen and was not the spouse of the actor at the time.

The General Assembly expressly set forth the purpose it sought to achieve in passing the Crimes Code. 18 Pa.C.S. § 104. It expressed one of its objectives as being "[t]o differentiate on reasonable grounds between serious and minor offenses, and to differentiate among offenders with a view to a just individualization in their treatment." *Id.* In these sections instantly under consideration the legislature has articulated with clarity when the age of the victim is to be relevant and in those instances the extent to which the age should impact upon the seriousness of the act. To give any further consideration to the age of the victim beyond the legislative directive would intrude upon the authority of that body's right to differentiate between the varying degrees of criminal behavior. It would also offend the express direction that "[t]he provisions of this title shall be construed according to the fair import of their terms...." 18 Pa.C.S. § 105.

It is also helpful in bringing into focus the issues raised herein to recognize that the convictions under section 3121 can be sustained only if the provisions of subsection (2) of that section have been established. Under the theory of the Commonwealth's case submission to sexual intercourse was accomplished by the *threat of,* rather than by actual "forcible compulsion." To attempt to argue that "forcible compulsion" can be expanded to include threats would render subsection (2) redundant. We may not assume that the legislature intended any of its statutory language to be mere surplusage. 1 Pa.C.S. § 1922(2); *Colodonato v. Consolidated Rail Corporation,* 504 Pa. 80, 470 A.2d 475 (1983); *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977); *Commonwealth v. Mack Brothers Motor Car Company,* 359 Pa. 636, 59 A.2d 923 (1948). It is also of significance to our decision to note that subsection (2) of section 3121 qualifies the "threat" as being one that "would prevent resistance by a person of reasonable resolution." Thus there is a clear

legislative expression that the offense requires not only some degree of compulsion but that the compulsion must reach a prescribed level of intensity designed to have an effect upon the will of the victim. An "objective" test has been established to determine whether the pressure generated upon the victim by the threat would be such as to overcome the resolve and prevent further resistance of a person of reasonable resolution. Thus any uniqueness in the emotional makeup of the victim is irrelevant in determining whether the threat possessed the requisite force to satisfy this element of the offense. What is germane is its impact on a person of reasonable resolve.

## II.

In this setting we will now undertake to ascertain the legislative intent in its use of the term "forcible compulsion." Webster's Third New International Dictionary gives the following as a primary meaning of the noun "compulsion": "an act of compelling: a driving by force, power, pressure or necessity...." The legislative use of the adjective "forcible" was obviously an effort to describe the particular type of compulsion required. The same source instructs us that the adjective "forcible" may be employed to convey that something is "effected by force used against opposition or resistance...." Unlike the preceding discussion, isolating the words utilized by the legislature to convey the intended thought does not provide the precision that would justify an invocation of the "fair import" approach mandated by the Crimes Code. The term "forcible compulsion" does not describe either the intensity of the force nor does it tell us the source of the opposition or resistance that must be overcome. Fortunately, the impact of the force has been described as one sufficient to overcome the "resistance by a person of reasonable resolution." The meaning of that clause has already been discussed. Thus the only question remaining is the source of the opposition or resistance, i.e., the will or the intellect. A clarification of this issue is best assisted by the historical development of the underlying offense of rape in this Commonwealth.

At common law rape was defined as "carnal knowledge of a woman forcibly and against her will." 4 W. Blackstone, *Commentaries on the Laws of England* 209 (G. Sharswood ed. 1890). Prior to the enactment of our present Crimes Code, Pennsylvania's rape statutes merely codified this common law formulation. *See* Act of June 24, 1939, P.L. 872, § 721; Act of March 31, 1860, P.L. 382. "Force and absence of consent [were] essential elements of the crime of rape, both at common law and under the [1939 Penal Code]." *Commonwealth v. Shrodes*, 354 Pa. 70, 72, 46 A.2d 483, 484 (1946).

Under the traditional formulation of the crime of rape, the element of lack of consent, as manifested by the extent of the victim's resistance to her assailant's advances, became paramount in rape prosecutions. *See* Estrich, *Rape*, 95 Yale L.J. 1087 (1986). This, of course, focused attention on the actions of the victim rather than those of the defendant. Because of the emphasis on the victim's resistance, compulsion by threat was recognized only to a limited degree.

Because coercion may be effected by threat as well as by physical force, the common law punished intercourse achieved by certain forms of intimidation as rape. This version of the offense, however, was subject to strict construction. At common law and under derivative statutes, the actor's threats were significant chiefly to show that the woman was excused from the duty of "utmost resistance." In line with the traditional focus on victim behavior, courts often defined the kind of threat that might constitute rape in terms of the character and intensity of fear induced in the victim. The standard was demanding. Thus, one court held that a woman must resist to the utmost unless the actor's threats or behavior put her in " 'fear of death or great bodily harm,' a 'fear of great personal injury' or 'serious personal injury,' a fear that 'so overpowers her that she dares not resist,' a 'fear and terror so extreme as to preclude resistance.' " In addition to emphasizing that the woman's fear must

encompass harm of extreme gravity, the courts often required that her reaction be reasonable or, in indirect statement of the same idea, that the actor have present capacity to inflict the harm feared. Thus, proof that the actor compelled submission to intercourse by intimidating his victim did not necessarily make him guilty of rape. His threat had to induce in her a not unreasonable and virtually incapacitating fear of imminent harm—usually bodily injury. Otherwise, liability of the male depended upon the manifestation of non-consent by resistance to force.

Model Penal Code § 213.1 Comment 4(b), at 308–309 (Official Draft 1980) (footnotes omitted).

The gravamen of common law rape was the non-volitional participation of the woman in the act, either because of being overpowered by force or being confronted with imminent threat of serious bodily injury or both. In either of these instances the victim's submission was deemed not to be the product of her will and the nonconsensual quality of her participation was established.

There has never been a question that the gravamen of the crimes of rape and the later statutory offense of involuntary deviate sexual intercourse was their non-volitional quality. Indeed, the title of the statutory offense defined under section 3123 (involuntary deviate sexual intercourse) clearly expresses the intention of retaining the non-volitional aspect of the crime. The departure from the common law formulation was to direct the focus upon the conduct of the alleged offender rather than upon the response of the victim. Thus the degree of compulsion created by the conduct was measured against an objective standard rather than attempting to evaluate the resistance of the particular victim in each instance. The degree of resistance, by that objective standard, was modified to remove the requirement that the victim continue the struggle when struggle would be useless and dangerous. This is reflected in our present standard requiring only that the conduct by the actor

"would prevent resistance by a person of reasonable resolution."

## III.

■ This historical review of the offense of rape provides no support for the position that there has been any discontent with the essence of that crime being an *involuntary* submission to sexual intercourse. The changes in the language in the formulation set forth under the 1939 Crimes Code and the present statute were merely to accommodate the complaints that had been articulated. The focus of the inquiry has been removed from the victim's actions to a scrutiny of the conduct of the offender. Moreover, the test of the degree of compulsion is now judged on an objective standard as opposed to a subjective one. However, the conclusion that the will was overborne is still critical to a finding that the offense has been committed. We are therefore satisfied that the adjective "forceful" was employed to establish that the assault must be upon the will. Nor does the modification of the former requirement appearing in some of our earlier cases requiring that the victim resist "to the utmost" in any way undercut this conclusion. As previously noted, the compulsion to submit is still the requirement although we no longer require that involuntariness must be demonstrated by useless resistance which would further imperil the victim's safety.

■ The critical distinction is where the compulsion overwhelms the will of the victim in contrast to a situation where the victim can make a deliberate choice to avoid the encounter even though the alternative may be an undesirable one. Indeed, the victim in this instance apparently found the prospect of being returned to the detention home a repugnant one. Notwithstanding, she was left with a choice and therefore the submission was a result of a deliberate choice and was not an involuntary act. This is not in any way to deny the despicable nature of appellee's

conduct or even to suggest that it was not criminal.[6] We are merely constrained to recognize that it does not meet the test of "forcible compulsion" set forth in subsections (1) and (2) of sections 3121 and 3123.[7]

Any lingering question as to the accuracy of our interpretation of the legislative intent in using the term "forcible compulsion" to require a non-volitional submission evaporates in view of the legislative decision to define the new offense set forth under section 3123 as *involuntary* deviate sexual intercourse. Under the rules of statutory construction we are instructed that "[t]he headings prefixed to ... sections ... shall not be considered to control but may be used to aid in the construction thereof." 1 Pa.C.S. § 1924. It would be highly improbable that the General Assembly would employ the term "involuntary" to describe a crime intended to embrace willful submission by the victim. The legislature has clearly indicated its awareness of the distinction between "involuntary" and "voluntary" in its entitling section 3124 as the offense of voluntary deviate sexual intercourse.[8] 18 Pa.C.S. § 3124. In that subsections (1) and (2) of sections 3121 and 3123 are identical, it would be absurd to argue that the latter section's use of the language intended to convey involuntary submission and that the former did not. 1 Pa.C.S. § 1922(1).

In reaching its conclusion that the charges of rape and attempted rape were not established, the majority of the

---

**6.** Again we must stress that we are not discussing the general criminality of appellee's conduct, but rather whether the elements of the specific crime charged have been established.

**7.** These conclusions compel us, with equal force, to conclude that this conduct would not establish the offense of involuntary sexual deviate intercourse as defined under 3123(1) and (2). However, the conviction for this offense can stand under 3123(5) since the victim had not reached the age of 16 and was not the spouse of appellee.

**8.** Section 3124 provides:

**Voluntary deviate sexual intercourse**
A person who engages in deviate sexual intercourse under circumstances not covered by section 3123 of this title (related to involuntary deviate sexual intercourse) is guilty of a misdemeanor of the second degree.

Superior Court erroneously inferred that the term "forcible compulsion" required physical violence. As we have indicated, the term "forcible compulsion" was employed to convey that the result produced must be non-voluntary rather than to describe the character of force itself. Certainly, psychological coercion can be applied with such intensity that it may overpower the will to resist as effectively as physical force. *See e.g., Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986). The purpose of the term was to distinguish between assault upon the will and the forcing of the victim to make a choice regardless how repugnant. Certainly difficult choices have a coercive effect but the result is the product of the reason, albeit unpleasant and reluctantly made. The fact cannot be escaped that the victim has made the choice and the act is not involuntary.

Accordingly, for the reasons set forth herein, the order of the Superior Court is affirmed.

HUTCHINSON, former J., did not participate in the consideration or decision of this case.

FLAHERTY and ZAPPALA, JJ., join in this Opinion in Support of Affirmance.

LARSEN, J., files an Opinion in Support of Reversal in which PAPADAKOS, J., joins.

McDERMOTT, J., files an Opinion in Support of Reversal.

## OPINION IN SUPPORT OF REVERSAL

LARSEN, Justice.

Threatening to have her placed in physical confinement unless she complied with his demands, Joseph Mlinarich, at sixty-three years of age, engaged in sustained, systematic sexual abuse of a fourteen year old child with low mental abilities, despite her continual crying, her pain and her pleading with him to stop. Those members of the Court in support of affirmance find in this neither "forcible compul-

sion," nor the "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution," 18 Pa.C.S.A. § 3121(1) and (2), and would rule as a matter of law that the child-victim *voluntarily* agreed to have sexual intercourse with her sixty-three year old custodial supervisor of her own free will. Thus, as the Superior Court's decision is affirmed because this Court is equally divided, the injustice and manifest error of that decision is perpetuated. I would reverse.

The victim in this case was placed in a juvenile detention center by her brother "to teach her a lesson" for having taken a ring of his which she lost. She has indeed been "taught a lesson," a cruel and traumatic one about the depravity of some men, and now about the unresponsiveness, unfairness and failure of the criminal "justice" system when it comes to the victims of crimes.

After several frightening days in the detention center, the victim was released on May 26, 1981 in the custody of her neighbors, Mr. and Mrs. Mlinarich, for whom the victim had done housework. Mrs. Mlinarich, a nurse at a local hospital, was never in the house when her husband sexually abused the child. Joseph Mlinarich held the power to deprive this child of her liberty, and he threatened to exercise this power and have her placed back under lock and key in the detention center if she did not comply with his sexual requests or if she told anyone about his sexual activity.

Waiting until the very day on which he could no longer face prosecution for statutory rape (18 Pa.C.S.A. § 3122), namely May 28, 1981, the child's fourteenth birthday, Mlinarich began a six week ordeal of escalating sexual assaults on this victim, which started with compelling her to remove most of her clothing and fondling her, escalated to attempted sexual intercourse and sexual intercourse, and further degenerated to involuntary occasion, including the two attempts at sexual intercourse (which failed only because Mlinarich could not achieve penetration) and deviate sexual intercourse (oral, or "per os"). On *each* occasion, including

the two attempts at sexual intercourse (which failed only because Mlinarich could not achieve penetration) and one act of sexual intercourse, the victim refused Mlinarich's requests, but she offered no physical resistance after he threatened to have her physically confined in the detention center. On the three occasions of sexual intercourse and attempts, the victim told Mlinarich she did not want to "do anything" with him, but nevertheless he persisted, despite her pain, her continual crying, her "screaming and hollering" and her pleas to stop. The jury called these acts rape and attempted rape. The Opinion in Support of Affirmance says the jury was wrong because a person of reasonable resolution would have withstood Mlinarich's threats and advances, and would hold that this fourteen year old child voluntarily consented to have sexual intercourse with the sixty-three year old Mlinarich of her own free will and volition.

To the affirming members of this Court, the victim "was left with a choice and therefore the submission was as a result of a deliberate choice and was not an involuntary act." Slip op. at 15. The Opinion in Support of Affirmance acknowledges that hers was a "difficult" choice, but states that the sexual intercourse was "the product of the reason, albeit unpleasant and reluctantly made. The fact cannot be escaped that the victim has made the choice and the act is not involuntary." Slip op. at 17. Has civilization fallen so far, have our values become so distorted and misplaced, as to leave a fourteen year old child without protection when she is forced to make such an awful "choice"? Thus does the criminal "justice" system, once again, place the blame of sexual abuse upon the victim of that abuse. Thus does the criminal "justice" system take a giant step backward towards the universally condemned state of the law where the rape victim was put on trial and blamed for seducing her assailant by "asking for it" and by not putting up enough resistance.

There are certain points on which I agree with the Opinion in Support of Affirmance. The first is that "the term

'forcible compulsion' includes both physical force as well as psychological duress." Slip op. at 1338. Indeed, this was the primary thrust of our recent decision in *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986). The second point is that section 3121(1) and (2) remains concerned, as at common law and under the Penal Code of 1939, with conduct of the defendant which overbears the will of the victim. Slip op. at 1341–1342. However, I part company with the application of these two points. Initially, I believe that Mlinarich's threats to deprive this child of her liberty and to have her physically confined constituted threats of *physical force and violence. Moreover, if Mlinarich's conduct here did not constitute "psychological duress" which overwhelmed the will of the victim, then I doubt that any conduct could.*

One wonders what is the "prescribed level of intensity designed to have an effect upon the will of the victim," slip op. at 10, that will satisfy the criteria of those who would affirm Superior Court and prove to their satisfaction that the victim's will was overborn and that her participation in sexual intercourse was "non-volitional." If a man threatens to lock a woman (say a utility company meter reader) in his basement, and tells her he will keep her there until she has intercourse with him, and she then complies, would such compulsion reach the "prescribed level of intensity"? If a policeman, or someone posing as a policeman, pulls a female motorist to the side of the road at night and threatens to throw her in jail until morning unless she has intercourse with him, and she complies, would such compulsion satisfy the majority's "prescribed level of intensity"? If a male judge calls a female litigant into his chambers, and tells her he will find her in contempt of court and have her thrown in jail unless she has intercourse with him, and she complies, would such compulsion reach the majority's "prescribed level of intensity"?

I would find, under all of these hypothetical circumstances, sufficient evidence *to allow the jury to decide* whether sexual intercourse was accomplished by "forcible compul-

sion" or by the "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." The members of this Court in support of affirmance would, no doubt, remove this decision from the jury's consideration, and would hold as a matter of law that these victims were "left with choices, albeit difficult and unpleasant ones," and since they chose of their own "free will" to engage in sexual intercourse rather than the "unpleasant" alternatives, their choices were "deliberate" and were "the product of reason" and were merely, therefore, consensual acts of intercourse.

In a recent novel by William Styron, "Sophie's Choice," the principle character was forced by a Nazi gestapo officer to make a horrifying choice. She was ordered to either choose one of her two children to remain with her while the other was sent to a German concentration camp possibly to die, or to watch both of them be sent away. By no conceivable stretch of the imagination could it be said that "Sophie's Choice" was a voluntary, consensual choice, although, in the reasoning and language of the majority, she was "left with choices, albeit difficult and unpleasant ones," and her choice was a "deliberate" exercise of her "free will" and the "product of reason."

The Opinion in Support of Affirmance recognizes the pernicious feature of the common law of rape and derivative statutes which focused attention on the conduct of the victim and ended up putting her on trial, which focus resulted in the various "resistance" requirements. Quoting the comments to section 213.1 of the Model Penal Code, that opinion observes:

At common law and under derivative statutes, the actor's threats were significant chiefly to show that the woman was excused from the duty of "utmost resistance." In line with the traditional focus on victim behavior, courts often defined the kind of threat that might constitute rape in terms of the character and intensity of fear induced in the victim. The standard was demanding. . . . *In addition to emphasizing that the woman's fear must*

*encompass harm of extreme gravity, the courts often
required that her reaction be reasonable or, in indirect
statement of the same idea, that the actor have present
capacity to inflict the harm feared.* Thus, proof that
the actor compelled submission to intercourse by intimi-
dating his victim did not necessarily make him guilty of
rape. *His threat had to induce in her a not unreason-
able and virtually incapacitating fear of imminent
harm*—usually bodily injury.

Slip op. at 1340–1341 (emphasis added).

Purporting to appreciate the injustice in this exaggerated
focus on the victim's fear (was it reasonable?) and her
resistance (was it enough?), the Opinion in Support of
Affirmance indicates in one breath that the modern law has
changed all that, stating that the Crimes Code has shifted
the focus from the conduct of the victim to the conduct of
the actor, stating:

Thus the degree of compulsion created by the conduct
[under the Crimes Code] was *measured against an objec-
tive standard rather than attempting to evaluate the
resistance of the particular victim in each instance.
The degree of resistance, by that objective standard, was
modified* to remove the requirement that the victim con-
tinue the struggle when struggle would be useless and
dangerous. This is reflected in our present standard
requiring *only that* the conduct by the actor *"would
prevent* resistance by a person of reasonable resolution."

Slip op. at 1341 (emphasis added).

Yet in the next breath, the Opinion in Support of Affirm-
ance turns around and places the focus of attention in a
rape prosecution squarely *back on the victim,* only this
time that focus is achieved in a more subtle, but no less
pernicious, manner. Instead of requiring the victim to
resist "to the utmost," she is now required to satisfy the
court that she withstood a "prescribed level" of compulsion.
Under this formulation, the court is able to overrule the
jury's determination and make its own determination as to
"whether the pressure generated upon the victim by the

threat" was of sufficient intensity "as to overcome the resolve and prevent *further* resistance of a person of reasonable resolution." Slip op. at 1340 (emphasis added). Hence, the Opinion in Support of Affirmance finds this child-victim's resolve lacking, because she should have been able to further resist Mlinarich's sexual commands—it was not enough that the fourteen year old child initially refused her sixty-three year old custodial supervisor, screamed, hollered, and cried continually, begged him to stop and ceased further resistance when he threatened to put her back in the detention center; no, this victim was, to the affirming members of this Court, not a person of reasonable resolution (although she was such a person to the jury).

The Opinion in Support of Affirmance maintains the notion that we are able to devine some *purely objective* standard to measure the "prescribed level of intensity" of the actor's conduct, which will in turn lead us to a *purely objective* measurement of the victim's resolve, which will thus allow us to answer whether the actor's threat of forcible compulsion actually was of sufficient "pressure" to prevent resistance by a person of reasonable resolution. Under such a purely "objective test," the actual resolve of the actual victim is measured against that of the proverbial "Reasonable Man" (or rather, the "reasonable victim") without regard to the actual victim's age, mental abilities, status vis a vis the defendant, or any individual characteristics or circumstances—indeed, *"any uniqueness in the emotional makeup of the victim is irrelevant* in determining whether the threat possessed the requisite force to satisfy this element of the offense." Slip op. at 1340.

This perceived legislative intent to create a purely objective measurement of the victim's resolution is arrived at as follows: 1) the legislature split the crime of rape into four categories of rape, 18 Pa.C.S.A. § 3121(1)–(4), and the crime of statutory rape of a person under the age of fourteen, 18 Pa.C.S.A. § 3122; 2) the legislature created a single crime

of involuntary deviate sexual intercourse [1] containing four categories identical to the four rape categories and an additional age-related category where the victim is "less than 16 years of age," 18 Pa.C.S.A. § 3123(1)–(5); 3) since the legislature has concerned itself with age of the victim in these sections, it "would intrude upon the authority of that" body for a court or jury "to give any further consideration to the age of the victim;" 4) and since the legislature has *therefore* precluded consideration of the victim's age in all contexts other than the aforementioned sections of Chapter 31 ("Sexual Offenses"), it has *also* precluded consideration of *any other* subjective factors and renders *"any uniqueness* in the emotional makeup of the victim ... irrelevant." Slip op. at 1338–1340.

This "logic" requires quantuum leaps of faith from step two to step three, and again from step three to step four. More importantly, this stilted reasoning defies real logic and common sense, ignores recent precedent of this Court and ignores explicit language of the legislature contained in other relevant provisions of the Crimes Code.

First, the age of the victim as dealt with in the separate provisions for rape, statutory rape and involuntary deviate sexual intercourse are directed at different evils, *see Commonwealth v. Walker*, 468 Pa. 323, 362 A.2d 227 (1976) *and Commonwealth v. Norris*, 498 Pa. 308, 446 A.2d 246 (1982), and the differing treatment of age within these provisions does not preclude a court from taking age into account in other contexts such as the equation of whether sexual intercourse was achieved by forcible compulsion or the threat of forcible compulsion that would prevent resistance by a person of reasonable resolution.

Second, this reasoning and conclusion are *flatly contradicted by other provisions of the Crimes Code.* The Opinion in Support of Affirmance reasons that, with section 3121(2) ("threat of forcible compulsion that would prevent

---

1. "Deviate sexual intercourse" is defined as "Sexual intercourse per os or per anus between human beings who are not husband and wife, and any form of sexual intercourse with an animal." 18 Pa.C.S.A. § 3101.

resistance by a person of reasonable resolution") the legislature "modified ... the requirement that the victim continue the struggle when struggle would be useless and dangerous," and in 1972 adopted a purely objective requirement that the victim resist as much as a court determines that a person of reasonable resolution" should have resisted without regard to any of the peculiar characteristics of the victim such as age. The legislature, however, amended Chapter 31 of the Crimes Code four years later to provide:

### § 3107. Resistance not required

*The alleged victim need not resist the actor* in prosecutions under this chapter: *Provided, however, that nothing in this section shall be construed to prohibit a defendant from introducing evidence that the alleged victim consented* to the conduct in question.

18 Pa.C.S.A. § 3107 (emphasis added).

This section does not merely "modify" the "degree of resistance requirement in sexual assault cases," it makes it clear that *there is no such requirement*—period! By the same token, it maintains the *defense* of consent of an alleged victim.

There is *some* objective measurement in the language "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution," but section 3107 clarifies that this is not a requirement that *the victim* must have put forth some minimum level of actual resistance. This language does ensure that the threat must meet some minimum level of forcible compulsion, so that mere seduction or persuasion will not suffice; however, the language is not meant to require some minimum level of actual resistance or to preclude the jury from considering the emotional makeup of the victim in determining whether the actor used forcible compulsion to overbear her will.

Section 311 of the Crimes Code, 18 Pa.C.S.A. § 311 *Consent,* provides, in relevant part:

(a) **General rule.**—*The consent of the victim* to conduct charged to constitute an offense or to the result thereof *is a defense if such consent negatives an ele-*

*ment of the offense* or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense.

*   *   *   *   *   *

**(c) Ineffective consent.**—Unless otherwise provided by this title or by the law defining the offense, *assent does not constitute consent if:*

(1) *it is given by a person who is legally incompetent* to authorize the conduct charged to constitute the offense;

(2) *it is given by a person who by reason of youth, mental disease or defect or intoxication is manifestly unable or known by the actor to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense;*

(3) it is given by a person whose imnprovident consent is sought to be prevented by the law defining the offense; or

(4) *it is induced by force, duress or deception* of a kind sought to be prevented by the law defining the offense. (emphasis added)

(The official comments to subsection (c) (Purdon's supp. 1987) state that this is in accord with existing law, citing authority wherein it was held that "consent" to intercourse by a woman who is insane is not a defense if the actor knew her to be insane, and that "consent" obtained through fraud or deception is no defense.) As this provision makes clear, *assent* to the defendant's conduct does not constitute *consent* if that assent is procured by "force, duress or deception" or is given by an incompetent or by a person who by reason of her youth, mental condition or intoxication cannot make a reasonable judgment. These are *subjective* factors which the legislature has provided *must* be taken into account. With the interplay of sections 3121(1), 3107 and 311, therefore, we can see the legislative intent and scheme to establish some objective standard regarding a minimum level of forcible compulsion sufficient "to prevent resistance by a person of reasonable resolution;" however, that stan-

dard does not make the unique characteristics of the victim "irrelevant," as the Opinion in Support of Affirmance states, for sections 3107 and 311 establish that "resistance" and "assent" and "consent" are to be viewed from the perspective of a person of reasonable resolution in the victim's peculiar situation, considering subjective factors.

Finally, the historical overview of the common law of rape and the extended analysis of the interpretation of section 3121(1) and (2) set forth in the Opinion in Support of Affirmance assumes the posture of examining an issue of "first impression." The interpretation of section 3121(1) and (2) is not, however, an issue of first impression for in *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986), this Court dealt at length with precisely this issue.[2]

In *Rhodes*, the twenty year old defendant lured the eight year old victim into an abandoned building near a playground and had sexual intercourse with the victim although she "told him to stop." The Superior Court held inter alia, that there was no evidence of forcible compulsion or threat of forcible compulsion under section 3121(1) or (2) in that case because there was no evidence of physical force or violence. In reversing the Superior Court, we found the evidence sufficient to establish beyond a reasonable doubt that the crime of rape had been committed by forcible compulsion and by threat of forcible compulsion.

*Rhodes* analyzed at some length the adoption of section 3121 as part of the Pennsylvania Crimes Code of 1972, reviewed its predecessors at common law and under the Penal Code of 1939, compared these with the corresponding provisions of the Model Penal Code, reviewed the common understanding and definitions of the principal terms, and rejected the Superior Court's determination that the "forcible compulsion" or threat thereof needed to overcome a victim's will and prevent resistance under section 3121(1)

**2.** The only acknowledgement in the Opinion in Support of Affirmance to the existence of *Rhodes* is on the final page of the opinion, where it states: "Certainly, psychological coercion can be applied with such intensity that it may overpower the will to resist as effectively as physical force. *See e.g., Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986)." Majority slip op. at 261.

and (2) meant *only* physical force or violence or threat thereof. 510 Pa. at 543–44, 510 A.2d at 1220–26. We held:

> From all of the foregoing, therefore, we hold that "forcible compulsion" as used in section 3121(1) includes not only physical force or violence but also *moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will.*
>
> Closely related to section 3121(1) is section 3121(2) which applies to the situation where "forcible compulsion" is not actually used but is threatened. That section uses the phrase "by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." ... By use of the phrase "person of reasonable resolution," *the legislature introduced an objective standard regarding the use of threats* of forcible compulsion to prevent resistance (as opposed to actual application of "forcible compulsion.")
>
> The determination of whether there is sufficient evidence to demonstrate beyond a reasonable doubt that an accused engaged in sexual intercourse by forcible compulsion.... or by the threat of such forcible compulsion that would prevent resistance by a person of reasonable resolution is, of course, *a determination that will be made in each case based upon the totality of the circumstances that have been presented to the fact finder. Significant factors to be weighed in that determination would include the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.* This list of possible factors is by no means exclusive.

510 Pa. at 555–56, 510 A.2d at 1226 (emphasis added).

Thus, in *Rhodes* we recognized that threat of forcible compulsion that would prevent resistance by a person of

reasonable resolution" was an "objective standard" but one applied in light of the circumstances which actually existed, not in the abstract. Chief Justice Nix, author of the Opinion in Support of Affirmance, strongly supported this view when he stated in his concurring opinion in *Rhodes:* "the force necessary to constitute that crime [of rape] has been described as force sufficient to overcome the will of the victim.... *This test has a subjective aspect which takes into account the immaturity of the victim as well as all other factors bearing upon the will of the victim to resist."* 510 Pa. 565, 510 A.2d 1231 (Nix, C.J., concurring; emphasis added).

As former Justice Hutchinson noted in his concurring opinion in *Rhodes,* this objective/subjective standard is not unlike that applied in the context of confessions challenged by a defendant as involuntary. 510 Pa. at 566, 510 A.2d at 1232 (Hutchinson, J., concurring). The task of the fact finder in each case will be essentially the same: based on the totality of the circumstances, including age, did the victim agree to sexual intercourse or did the defendant confess to a crime voluntarily and of her/his own free will? Former Justice Hutchinson stated:

> Certainly, if a grown man can be coerced or compelled to confess to a crime by the questioning of an arresting officer, *see Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961), an eight year old victim of a sexual assault is no less likely to have had her will forcibly overcome by an adult male in the dirty, bare and unfamiliar place in which this crime took place. *It is, indeed, time for us to apply to the victims of crime the same protective standards that we give criminal defendants.*

*Id.* (emphasis added).

So too in the instant case, a fourteen year old child who had just spent several days in a detention center and was living under the "care" and supervision of a temporary foster family had her will overborn by the sixty-three year old adult male of this custodial family, who threatened her

with loss of liberty when she refused to accede to his perverted requests, as the jury in this case determined. These threats of forcible compulsion, i.e., physical confinement, were threats of physical force *as well as* psychological duress and were clearly sufficient, as the jury determined, to "prevent resistance by a person of reasonable resolution" considering the totality of the circumstances. Those circumstances show that this victim actually resisted, but that her will was overcome by the psychological coercion and duress. This child-victim did not deliberately and voluntarily choose to engage in sexual intercourse with Joseph Mlinarich of her own free will, as the Opinion in Support of Affirmance would hold.

*Rhodes* is the law of this Commonwealth, and is unquestionably dispositive in this case; *Rhodes* compels the conclusion that Mlinarich engaged in sexual intercourse with the child victim without her consent and by forcible compulsion or its threat. The Opinion in Support of Affirmance does not attempt to distinguish *Rhodes,* nor does it attempt to explain in any way why it is not controlling. Instead, the three members of this Court in support of affirmance simply ignore *Rhodes* and pretend that it does not exist. *Rhodes* does exist, however, and remains the law of this Commonwealth.

For all of the foregoing reasons, I enter this Opinion in Support of Reversal, and I implore the legislature to correct this misreading of its intention and the injustice it will cause. Sadly, it is too late for the legislature to correct the injustice done to this child-victim.

PAPADAKOS, J., joins in this Opinion in Support of Reversal.

## OPINION IN SUPPORT OF REVERSAL

McDERMOTT, Justice.

The crime of rape is accomplished when a person "engages in sexual intercourse with another person not his spouse ... by threat of forcible compulsion that would

prevent resistance by a person of reasonable resolution." 18 Pa.C.S. § 3121(2).

The gravamen of rape is to take what would not be given except for "forcible compulsion", or "threats" of forcible compulsion.

That all threats, however compelling in the mind of the actor, leave a choice in the victim is not to be denied. If one yields their bodily integrity for small reason the law may imply their consent. What reasons are small and what sufficient to compel assent are subject to interpretation under the circumstances of the occasion. Not every threat is necessarily such that it presents an illegal choice to persons of reasonable resolution.

The question here is whether the return of a person to confinement qualifies as a threat of forcible compulsion sufficient to overcome reasonable resolve. If it is such, then whether fact finders could find that it in fact overcame reasonable resolution, given the circumstances, remains for them to decide.

Three members of this Court have decided, however, that the question cannot be put, because to their minds the victim had choices that could be exercised, choices that would have obviated the occasion. To my mind, under the circumstances here, that view is an arcane quibble.

A person may well believe that one who secured her release could return her to confinement. Confinement in a detention facility is, among other things, a *punishment* provided by law, which by its very nature is a serious loss in the life of a person: a condition only imposed, as a last resort, by proper judicial officers. Its purposes and unpleasantness were not designed as an adjunct for would-be rapists.

Here the threats were employed to deprive the victim of her freedom; to institutionalize her if she did not yield. The size of the dread imposed upon her is certainly a question for fact finders to determine, and not a question of law that implies there could be no forcible compulsion in

such a threat. The question is not whether she could make a choice to yield or be confined, but whether the law should allow such a choice at all. The purpose of law is to narrow the choices that may be offered to compel others in order to gain an end of one's own. Certainly, we should be spared, where possible, choices imposed by others that require surrender or certain punishment. *See generally Commonwealth v. Plank*, 329 Pa.Super. 446, 453, 478 A.2d 872, 876 (1984).

The threat of confinement, that a victim could believe possible, is objectively a threat of forcible compulsion that could, as here, overcome a person's reasonable resolve. It ought not be a choice one may legally impose upon another. The actor believed it sufficient to gain his end and so did the jury. Under any standard we ought not to countenance, as a game of choices, so clear and deliberate a threat.